■ In the Matter of Nelson F. McGinigle, Petitioner, v Town of Greenburgh et al., Respondents.—Proceeding pursuant to CPLR article 78, *inter alia,* to (1) review a determination of the respondent Town of Greenburgh, which, after a hearing pursuant to section 75 of the Civil Service Law, found the petitioner guilty of three charges of misconduct and dismissed him from his employment with the town and (2) compel his reinstatement as a water and sewer maintenance man, grade II, with the town's Department of Public Works, with back pay. Petition granted and determination annulled, on the law, without costs or disbursements, and respondents are directed to reinstate petitioner to his position, with back pay and such other benefits to which he may be entitled, retroactive to August 20, 1974, less the amount of compensation earned in any other employment or occupation and any unemployment benefits he may have received during such period. Petitioner entered the employ of the Department of Public Works of the respondent Town of Greenburgh in 1973 as a water and sewer maintenance man. On July 25, 1974 petitioner engaged in a scuffle with an insubordinate teenage worker, during which the boy was pushed to the ground but suffered no injuries. Petitioner was discharged for this action, but was reinstated two weeks later, without back pay, at the behest of the local Civil Service Employees Association unit. However, petitioner was not returned to his former position as a meter reader for the town, but rather, was directed to report as the sole relief operator at the town's water pumping station on Knollwood Road. He first reported for duty on August 9, 1974 *for a shift running from either midnight to 8:00 A.M., or 11:30 P.M. to 7:30 A.M.* His duties in this three-story pumping facility, where petitioner had not previously worked, included watching the machinery dials and maintaining building security. Within three hours after he went on duty, in the early morning hours of August 10, 1974, a fire started in the basement and caused substantial damage. Arson investigators conclusively determined that the fire had been deliberately started by an arsonist with the aid of an accelerant and had not been caused by an accident, mechanical failure or spontaneous combustion. Immediately, petitioner became the only suspect inasmuch as all of the doors had been locked and petitioner had conceivably been motivated to commit arson as revenge for his recent discharge. The Greenburgh Public Works Commissioner, Kevin O'Neill, directed that petitioner submit to a lie detector examination (not the traditional polygraph, however, but rather a B & W psychometer) or face immediate dismissal. Petitioner refused. The town then served the petitioner with three written charges: (1) that on July 25, 1974 he had wrongfully assaulted a subordinate employee; (2) that on the morning of August 10, 1974 he had *either* committed arson, or was grossly negligent in the maintenance of security by

allowing an arsonist onto the property; and (3) that in connection with an official investigation into the cause of the fire, he had wrongfully refused to submit to the lie detector examination. A hearing pursuant to section 75 of the Civil Service Law was held, at the conclusion of which the hearing officer determined that all three charges had been sustained. With respect to punishment, the hearing officer recommended that the petitioner be discharged on the basis of the second and third charges, i.e., the fire and his refusal to take a lie detector test, but that his prior two-week suspension without pay be deemed adequate punishment for the first charge, the scuffle with the teenager. The town formally adopted these recommendations and so informed the petitioner by letter dated September 22, 1976, adding that the town would consider the discharge "effective as of August 20, 1974", the date of his official suspension. Petitioner thereupon commenced the instant CPLR article 78 proceeding. The determination must be annulled and the petition granted. Our inquiry, of course, is to ascertain whether the town's determination "on the entire record, [is] supported by substantial evidence" (see CPLR 7803, subd 4). In reaching our conclusion, we are mindful of the fundamental rule that "it is not the function of a reviewing court to substitute its judgment for that of an administrative body when the wisdom of the discretionary act is questioned, unless the determination lacks such relevant evidence as a reasonable mind might accept as adequate to support the conclusion" (Delfino v Carmody, 56 AD2d 833; accord Matter of 330 Rest. Corp. v State Liq. Auth., 26 NY2d 375). The rule was summed up in Matter of Pell v Board of Educ. (34 NY2d 222, 231): "Rationality is what is reviewed under both the substantial evidence rule and the arbitrary and capricious standard (Matter of 125 Bar Corp. v. State Liq. Auth., 24 N Y 2d 174, 178; 1 N. Y. Jur., Administrative Law, § 184.)" Upon the record, it is quite clear that, not only does the town's determination fail to rest upon substantial evidence, it fails to rest upon anything but a bare minimum of circumstantial evidence. With respect to the charge of arson or gross negligence in having allowed the arsonist to enter the premises, it is abundantly clear that petitioner could not be guilty of both; the two are mutually exclusive. The record conclusively establishes that when the firemen arrived in response to petitioner's alarm, all of the doors were securely locked. Indeed, the firemen had to be let in by petitioner, who unlocked the door. It thus follows that petitioner did properly maintain the security of the building and, hence, a finding of gross negligence is clearly unjustified. This is particularly clear since, as the record shows, the heavy machinery on the third floor, where petitioner claims to have been and should have been, was very noisy. Thus, there would be little probability that one on the third floor would have heard an intruder setting a fire in the basement. There is certainly no evidence in this record from which it could be found that petitioner was remiss in failing to detect the presence of an intruder. Likewise, a finding, even circumstantially, that petitioner himself was the arsonist, lacks substantial evidence on the record. Undoubtedly, arson occurred, and petitioner was the only person who was supposed to have been on the premises at that time. However, this does not mean that petitioner was, in fact, the only person on the premises, particularly in the light of the finding that at least three other men possessed keys to the outer door, none of whom were questioned. Arsonists seldom leave calling cards, yet it seems that no serious investigation was made into the possibility that someone other than petitioner committed the arson by, e.g., checking to see whether an intruder had picked the lock. From the outset, the town authorities focused on petitioner and petitioner alone. Equally clear is

the fact that the other elements of respondents' circumstantial evidence fail to sustain the charge upon close scrutiny. For example, respondents argue that "the Fire Department found that when it arrived at the scene of the fire petitioner was 'excited' and especially anxious to assist the firemen in subduing the fire". Actually, this proves nothing, inasmuch as it is not surprising that an individual, alone and locked in a burning, unfamiliar building in the middle of the night, would indeed be "anxious" to see the flames extinguished. Likewise, the contention that "it was the petitioner who swept up the debris thereby making it more difficult for the police and fire inspectors to investigate the origin of the fire", proves nothing. Sweeping debris after a fire is, per se, an unsuspicious act which would be expected of any individual under similar circumstances, particularly in the absence of an allegation that the petitioner deliberately swept up the debris *after* being specifically instructed not to do so. Finally, respondents seek to circumstantially imply that the petitioner was guilty, since "suspicions were enhanced when [town authorities] discovered that petitioner had been involved in other fires of 'suspicious origin'." The record belies this contention, unequivocally establishing that two other suspicious fires occurred on June 5, 1974 and June 8, 1974 near the *same* pumping facility and not just on any property owned by the town. Evidently, someone in the community took a distinct dislike toward this particular facility. But the dates of these other two suspicious fires are significant; they occurred six weeks *prior* to petitioner's suspension over the incident involving the insubordinate teenager and, hence, could not have been motivated by revenge on his part. Under these circumstances, it is inescapably clear that "the administrative action is without foundation in fact" (see 1 NY Jur, Administrative Law, § 184, p 609) and " 'is unsupported by proof sufficient to satisfy a reasonable man, of all the facts necessary to be proved in order to authorize the determination' " (see *Matter of Pell v Board of Educ.,* 34 NY2d 222, 231, *supra,* citing *Matter of Weber v Town of Cheektowaga,* 284 NY 377, 380). With respect to the charge of wrongfully refusing to submit to a polygraph test, it is clear that the petitioner was justified in refusing to take the examination. Clearly, a good faith investigation concerning the purported misconduct of a public servant is a permissible state interest. Yet, "The issue then reduces itself to a determination as to whether the pursuit of that justifiable interest may be furthered by the use of" the lie detector machine utilized by the town, i.e., the B & W psychometer (see *Dolan v Kelly,* 76 Misc 2d 151, 154). In *Dolan* the court at Special Term held that a public servant (a police detective) may be discharged for his refusal to submit to a polygraph lie detector machine, operated by a trained expert, with respect to an investigation concerning only his official conduct in office. *Dolan* was subsequently cited by the Court of Appeals with approval (see *Pereira v Pereira,* 35 NY2d 301, 307). However, underlying these cases are two fundamental principles. (1) A polygraph machine was used. That machine *permanently records* and preserves for future scrutiny, the involuntary body responses of four separate body functions: changes of blood pressure, pulse rate, respiration and the skin's resistance to electricity. (See *United States v Ridling,* 350 F Supp 90, 92–93; *Romero v State,* 493 SW2d 206 [Tex].) The permanent recording of the four separate functions carries with it both present and future indicia of reliability; hence, it is a proper investigative tool. (2) The "test [can be] expertly prepared and administered and interpreted by a qualified person" *(Dolan v Kelly,* 76 Misc 2d 151, 157, *supra; accord Pereira v Pereira, supra,* pp 307–308). The machine which the town sought to use herein meets neither of these standards. Petitioner

refused to be tested on the B & W psychometer. This is a machine which not only makes no permanent record or graph for future interpretation, it tests *one* bodily response, i.e., changes of electrical resistance in the skin, and can be easily upset, resulting in inaccurate results, merely by a door slamming, a telephone ringing, or virtually any physical movement of the subject, even coughing. Unlike the traditional, commonly used polygraph machine, the reliability of the B & W psychometer is highly questionable. Furthermore, the individual who was to administer the test to the petitioner conceded that he had attended absolutely no training courses, was merely instructed by a representative of the manufacturer for "about * * * one hour" and basically taught himself. Under the circumstances, respondents' reliance on *Dolan* is misplaced, and petitioner's refusal to take the test was a justified response to an arbitrary order (see *Matter of Pell v Board of Educ.*, 34 NY2d 222, 231, *supra*). Martuscello, J. P., Margett, Suozzi and O'Connor, JJ., concur.