Witmer, J.
Involved in this appeal are questions of (1) the admissibility of evidence of certain polygraph tests, (2) basic procedures required in a civil contempt proceeding and (3) the sufficiency of the evidence with respect to finding defendant guilty of civil contempt.
Plaintiff instituted this proceeding in April, 1973 to enforce the terms of the judgment of divorce granted to her on February 15, 1973 wherein custody of the two children of the marriage, namely, the son, Angel, bom January 7, 1964 and the daughter, Alice, born October 3,1966 were awarded to her. On July 7,1972, seven months before the divorce, Alice had disappeared, and plaintiff contends that defendant had a part therein. At the time of the divorce the son was with plaintiff and continues to be with her, but Alice remains away.
In addition to other relief, plaintiff asked that defendant be found in contempt of court for failing and refusing to comply with the judgment of divorce in which custody of the children was awarded to her, and she alleged that defendant’s mother had some knowledge of Alice’s whereabouts. Defendant interposed an answering affidavit to the petition, denying that he caused Alice to disappear, that he had anything to do with her disappearance and that he has any knowledge of her whereabouts. He stated, “ I categorically and vehemently deny any knowledge of the whereabouts of my daughter, Alice Pereira. I pray to Grod I wish I knew where she is or whether or not she is safe and well. Plaintiff’s motion to seek the whereabouts of our daughter is in all respects made jointly, as I too want to discover the mystery of her disappearance.” The record contains no order by the court or reference to .such 'an order, entered before this proceeding was started, determining that defendant had possession of Alice and implementing the judgment of divorce by ordering him to deliver 'Alice to plaintiff.
After the original appearance on the petition, in the presence of the court, counsel for plaintiff and defendant stipulated that defendant and his mother, Frances Rivera, would submit to polygraph (lie detector) examinations with respect to the disappearance and whereabouts of Alice, to be conducted by the police department, and it was agreed that each of them would give an affidavit of his respective lack of knowledge about Alice’s dis *304 appearance and whereabouts, as bases for the polygraph examinations. The stipulation contained no provision for the use of the results of the polygraph tests. A hearing on the petition was adjourned pending the taking of such tests.
The examinations were conducted on, May 10, 1973 by Luis A. Palau, a detective with the New York City Police Department assigned to the Bronx County District Attorney’s office.
The court conducted a hearing on the petition on June 12,1973. Over defendant’s objection it received into evidence the results of the polygraph tests and permitted Mr. Palau to testify. He testified that for a period of six weeks prior to April 1, 1971 he took a course in Manhattan at the National Training Center of Lie Detection; that he had no prior training in such work, but he was also attending a college of criminal justice, looking forward to an associate degree, and he took a course in introductory psychology and one in abnormal psychology; but he had not obtained any college degree. He testified that since April, 1971 he had conducted over 200 polygraph tests and had many of them checked at the National Center of Lie Detection as part of his continuing training and association with that school; that Mr. Eichard 0. Arther, president of that school, was his principal instructor and consultant. Mr. Palau testified concerning the manner in which he administered the examination of defendant, the questions which he asked and his interpretation of the responses; and he concluded that defendant’s critical answers were false, i.e., his denials of knowledge of the abduction and whereabouts of Alice were false. Mr. Palau also testified that he could not tell the magnitude of a false answer, that is, whether it was a little lie or a big lie; that he does not know whether a witness’ anxiety to clear himself may cause the polygraph instrument to make lines suggesting his guilt even though he be innocent; that all emotional disturbances shown on the chart are not caused by lying; that expert observations of the subject during the test and interpretation of his reactions are required; and that he could not answer whether defendant was telling the truth in answer to the question whether defendant had-told the entire truth about the disappearance of Alice. He also stated that this occasion was the first time that he had ever testified as a polygraph expert.
*305 Mr. Arthur was also called as a witness. His qualifications as an expert in polygraphy with many years of experience are not questioned. He was not present when the examinations were given. He had reviewed them, however, and he testified that the tests were properly administered and that he agreed with Mr. Palau’s conclusions.
Plaintiff was then called to the stand. She testified that in the fall of 1972 and up to January 7, 1973, the son’s birthday, she had several conversations with defendant’s mother, Prances Rivera, concerning Alice’s disappearance and whereabouts. Defendant objected that such conversations, in his absence, were inadmissible against him, but the court overruled the objection on the ground that since defendant had stipulated that a polygraph test be taken of his mother who had then taken' the test, and Mr. Palau had testified concerning her answers during her test, plaintiff’s testimony of what Mrs. Rivera had previously told her was admissible on the issue of the truth of Mrs. Rivera’s polygraph answers. Plaintiff testified that Mrs. Rivera told her that she “believes” and “feels” that defendant took Alice away, and she assured plaintiff that Alice was alive, well, safe and living with a rich family. Plaintiff also testified that on January 7, 1973 defendant came to her home to help celebrate the son’s birthday, and in response to her questions about Alice defendant told her that, ‘1 when she was 18, maybe then she will come back to the house and give me a surprise of my life by returning on her own ’ ’.
Mrs. Rivera took the stand and denied that she ever told plaintiff that defendant knew where Alice is or that Alice is safe and well; and she testified that no such talk ever occurred. She added that she has no knowledge about Alice’s disappearance or whereabouts.
Defendant testified that he does not know where Alice is and had nothing to do with her kidnapping and knows nothing about it or whether she is alive. He denied telling plaintiff that Alice was alive; but testified that to console her he told her that since Alice’s body had not been found, plaintiff should not worry; that nothing is wrong with her and that when she is 15 years old she may surprise plaintiff by returning.
In answer to the court’s questions, defendant admitted taking little interest in the search for Alice after her disappearance, and *306 only after police requested it did he go to the police precinct and answer questions of the detectives with respect thereto.
In rendering its decision, the court found defendant in contempt of court with respect to the custody provisions of the judgment of divorce, it being “ impressed with, the abnormal conduct of1 the defendant in his apparent total lack of concern and lack of effort to locate his child ’ ’. The court found defendant’s testimony to be incredible and granted an order (June 14, 1973) that he deliver Alice to plaintiff within five days and, if he should not do .so, that the Sheriff detain him in the county jail until he shall deliver Alice to plaintiff. The Appellate Division modified the order by providing that in no event should defendant’s imprisonment exceed six months and that a review of the proceeding be held within 90 days after his imprisonment, as provided in section 774 of the Judiciary Law. As so modified, the findings of fact and the order of contempt were affirmed.
Thereafter, defendant having failed to deliver Alice to plaintiff, he was incarcerated on March 28, 1974. The record does not disclose that any order was obtained declaring him to be in default of the affirmed order of contempt and directing his incarceration therefor. Leave to appeal to this court was granted to defendant on May 10, 1974, at which time stay of execution of the order of imprisonment was granted pending the determination of the appeal, and defendant was released from jail.
We first consider the propriety of1 the admission into evidence of the results of the polygraph tests and testimony concerning them, bearing in mind that the parties stipulated that defendant and his mother would take the polygraph examinations.
In People v. Leone (25 N Y 2d 511) in a thorough consideration of the subject of the use of polygraph tests in criminal cases Judge Jasex, speaking for the court, wrote that the reliability of these tests had not yet been sufficiently established to justify their use in such cases. Less than five years have elapsed since that decision and no evidence has been presented to demonstrate that now “ their reasonable accuracy and general scientific acceptance are [more] clearly recognized ” (p. 518), which were there held to be prerequisite to their admission into evidence. Indeed, the contrary seems to be the case (see People v. Dodge, *307 72 Misc 2d 345; People v. Jacobson, 71 Misc 2d 1040). It appears to be still true that ‘ ‘ the criterion for interpretation of the test chart has not as yet become sufficiently definite to be generally reliable so as to warrant judicial acceptance; nor can it be said that the examiner’s opinion demonstrates reasonable certainty as to the accuracy of the polygraph tests in most instances ” (People v. Leone, supra, p. 517).
With respect to the admissibility of evidence of polygraph tests taken upon .stipulation of the parties, the courts are not in agreement. In many States the courts have concluded that where a defendant has stipulated to taking a polygraph test and that the results of the test and testimony by the examiner with respect thereto may be offered into evidence upon a trial, the same are admissible in evidence upon a showing that the test was competently administered (see People v. Leone, 25 N Y 2d 511, supra, cases cited in footnote on p. 514; also State v. McDavitt, 62 N. J. 36; State v. Ross, 7 Wash. App. 62). Other States have held, however, that, “ [a] stipulation for admission does not increase the reliability of polygraph results and, therefore, should not lead to any deviation from the exclusionary policy ” (Pulakis v. State, 476 P. 2d 474, 479 [Alaska]; accord Romero v. State, 493 S. W. 2d 206 [Tex.]; Conley v. Commonwealth, 382 S. W. 2d 865 [Ky. ]; State v. Trimble, 68 N. M. 406; Stone v. Earp, 331 Mich. 606; LeFevre v. State, 242 Wis. 416). We need not reach 'such question in this case, however, for the stipulation herein was a limited one — it did not provide for use of the polygraph tests in court. Where a matter of imprisonment is in issue the court should not expand the stipulation beyond its terms. It was not established that it was contemplated that the tests were to be used for other than investigatory purposes (see Dolan v. Kelly, 76 Misc 2d 151; Matter of Anonymous v. Anonymous, 75 Misc 2d 823).
Apart from the above considerations respecting the admissibility of polygraph tests when expertly administered, the evidence in this case, as above reviewed, establishes that the examiner who gave these tests was not sufficiently trained and expert to justify use of the tests in a court of law (see People v. Leone, supra, p. 516, n. 4; Romero v. State, supra, p. 214). The testimony of the expert, Arther, who was not present when *308 the tests were given, is not adequate to supply this vital deficiency. The court erred, therefore, in receiving into evidence the polygraph tests and testimony relating thereto.
Consideration must be given to the basic procedures prerequisite to a finding of civil contempt. We note, as above recited, that following the judgment awarding custody of the children to plaintiff, she instituted this proceeding to hold defendant in contempt of court for failing to deliver Alice to her. The contempt proceeding appears to have been premature, for at that time no specific order of the court, made upon a finding that defendant had possession of Alice, had been entered directing that he deliver her to plaintiff. In addition, after affirmance of the trial court’s order of June 14, 1973 directing defendant to deliver Alice to plaintiff or be incarcerated until he do so, the record discloses no application, pursuant to the terms of that order, for an order of commitment of the defendant for disobedience of the order of June 14 as affirmed. It may be inferred that the commitment was for violation of the judgment of February 15, 1973, which merely provided that the custody of the children was awarded to plaintiff. It contained no reference to the existing whereabouts of the children nor any direction to defendant with respect to them.
It has been held that ‘ ‘ the mandate alleged to be violated should be clearly expressed, and when applied to the act complained of it should appear, with reasonable certainty, that it had been violated ” (Ketchum v. Edwards, 153 N. Y. 534, 539; and see People ex rel. Porter v. Porter, 33 A D 2d 876; Matter of Carlson v. Podeyn, 12 A D 2d 810). The liberty of the defendant being at stake, the proceeding to find him in contempt of court should have been predicated upon a finding by the court that he was in possession or control of Alice and in violation of an express order of the court for her delivery to plaintiff, and thereafter his incarceration should have been founded upon an affidavit of his violation of the order of June 14, 1973 for delivery of Alice, not of his violation of the judgment of February 15,1973.
In any event, the evidence for plaintiff in this proceeding was woefully inadequate to establish that defendant was in contempt *309 of court. Plaintiff’s proof consisted only of alleged equivocal statements by defendant and his mother from which plaintiff and the trial court inferred that defendant had knowledge of the whereabouts of Alice and had control of her. Opposed to this, there is the categorical denial by defendant and his mother of any knowledge concerning the disappearance and existence of Alice. However one may be inclined to agree with the trial court’s conclusion that defendant’s conduct is suspect and his testimony incredible (with or without consideration of the evidence of the polygraph tests), such visceral reactions cannot be a substitute for evidence^ As Judge (then Justice) Stevens said in People v. Shapolsky (8 A D 2d 122, 126) in a case of alleged criminal contempt “ [s]peculation, surmise, deduction cannot supplant the requisite proof, nor serve as a substitute in meeting the obligation imposed by law. Before there can be a default in production or willful disobedience, proof of existence as well as ability to produce must be shown ”. Despite the obvious differences between cases of criminal contempt and those of civil contempt, it must likewise be held that before this defendant can be found in default of an order to produce and deliver his daughter to the plaintiff there must be proof that he has knowledge of her whereabouts and the ability to produce and deliver her.
At most, the evidence in this case permits speculation that defendant is concealing knowledge of Alice’s disappearance and whereabouts. Such evidence is insufficient to sustain a finding that he is in contempt of court for failing to produce her and deliver her to plaintiff. The order of the Appellate Division should, therefore, be reversed and plaintiff’s motion to punish defendant for contempt denied.
Chief Judge Bbeitel and Judges Gtabbielli, Jones, Wachtler, Babin and Stevens concur with Judge Wither.*
Order reversed, without costs, and plaintiff’s motion to punish defendant for contempt denied.

 Designated pursuant to section 2 of article VI of the State Constitution.