THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LINDA SMITH, Appellant.

Fourth Department, January 20, 1978

**APPEARANCES OF COUNSEL**

*Nathaniel A. Barrell (Henrietta Wolfgang* and *Rosalie M. Stoll* of counsel), for appellant.

*Edward C. Cosgrove, District Attorney (Judith Blake Manzella* of counsel), for respondent.

**OPINION OF THE COURT**

MOULE, J. P.

Defendant appeals from a judgment of conviction entered upon a jury verdict which found her guilty of the crime of conspiracy in the first degree.

On September 12, 1975 James Butler, Margaret Alvey, Gladys Pounds and defendant were indicted for the crimes of conspiracy in the first degree and murder in the second degree in connection with the death of John Yuhas. On April 29, 1976 the court ordered separate trials of the defendants. Defendant's trial commenced on May 17, 1976 and on June 18, 1976 the jury returned a verdict of not guilty on the murder count; the jury was unable to reach a verdict on the conspiracy count. Thereafter, on August 4, 1976 defendant was retried on the conspiracy charge and found guilty.

At this second trial the prosecution relied primarily on the testimony of Mona Yuhas, widow of the victim, who did not testify at defendant's first trial inasmuch as she had fled the jurisdiction. Yuhas testified that she lived with her husband and her mother, Gladys Pounds. In July, 1975, Yuhas overheard a telephone conversation between Pounds and her sister, Margaret Alvey, who resided in Indiana, during which Pounds expressed her hatred of the victim and the fact that she wanted him killed. Pounds told Alvey that she was willing to pay $1,000 to have the victim done away with and Alvey replied that she would take care of it. Yuhas further testified that her sister, Alvey, telephoned her shortly thereafter to inform her that defendant, who is her niece, and James Butler were coming to Buffalo. Butler arrived in late July, 1975 and stayed at the Yuhas home for a couple of weeks, after which he moved into a house already occupied by defendant. On August 21, 1975 Alvey arrived in Buffalo and took up residence at the Yuhas home. During the evening of August 23, 1975 Alvey visited defendant and Butler at defendant's house and the three returned to the Yuhas home at approximately 9:00 P.M. Defendant and Butler left the house immediately thereafter, after which the victim, who slept in a separate bedroom because of his tubercular condition, retired for the evening. Yuhas and Alvey remained in the house talking when defendant and Butler returned at about 1:30 A.M. Yuhas then went upstairs to bed but she was awakened by her husband yelling, "What are you doing in my bedroom?" and as she went to see what was happening, defendant grabbed her, threw her back into her bedroom and told her to stop hollering. When she attempted to go to her husband's aid a second time she saw Butler on top of his bed, hitting him with a knife or club.

In addition to the testimony of Mona Yuhas, defendant's oral and written statements made to the police, as well as a tape recording of a statement made by her, were admitted into evidence. This evidence showed that defendant had received a telephone call from her mother, Alvey, who informed her that her grandmother, Pounds, wanted the victim killed and would pay between one and two thousand dollars to have it done; that Butler and defendant's mother came to an agreement whereby Butler would carry out the murder; that on the night of the murder, defendant and Butler went to the Yuhas home and that after Yuhas went to bed, Butler went

upstairs to the victim's bedroom carrying a pool cue, gun and knife; that Butler distributed gloves to defendant and Alvey which they put on before the murder; that defendant heard yells and moans upstairs and restrained Yuhas from leaving her room; that she observed Butler in the victim's bedroom, saw blood on the floor and became ill; that Butler directed her to begin cleaning up and that thereafter they drove the victim's body, in his own car, to the Thruway, where they left the car and the body. In her recorded statement defendant stated that although she knew of the plan to kill the victim and Butler's agreement to carry out the plan, she did not know that Butler himself intended to commit the murder.

Finally, Yuhas' neighbors testifed that they heard activity and noises coming from the Yuhas home at approximately 3:00 A.M. on the morning of the murder. On August 24, 1975 the body of the victim was discovered in the trunk of his abandoned car. An autopsy revealed three bullet wounds to the head and eight stab wounds to the chest. Following defendant's testimony in her own behalf, by which she contradicted many of the facts that she had stated in her oral and written statements, the jury returned a verdict of guilty on the conspiracy charge.

Defendant first contends that her acquittal on the murder charge in the first trial requires an acquittal on the conspiracy to murder charge in her second trial and, therefore, that retrial on the conspiracy charge was improper.

The statute addressing this issue is CPL 310.70 which reads in pertinent part:

"1. If a deliberating jury declares that it has reached a verdict with respect to one or more but not all of the offenses submitted to it, or with respect to one or more but not all of the defendants, the court must proceed as follows:

"(a) If the possibility of ultimate agreement with respect to the other submitted offenses or defendants is so small and the circumstances are such that if they were the only matters under consideration the court would be authorized to discharge the jury pursuant to paragraph (a) of subdivision one of section 310.60, the court must terminate the deliberation and order the jury to render a partial verdict with respect to those offenses and defendants upon which or with respect to whom it has reached a verdict: * * *

"2. Following the rendition of a partial verdict pursuant to

subdivision one, a defendant may be retried for any submitted offense upon which the jury was unable to agree unless:

"(a) A verdict of conviction thereon would have been inconsistent with a verdict, of either conviction or acquittal, actually rendered with respect to some other offense".

The statute permits retrial for any offense upon which the jury was unable to agree unless a verdict of conviction thereon would have been "inconsistent" with a verdict actually rendered with respect to some other offense. Therefore, in order to determine whether defendant's retrial on the conspiracy charge was proper, it is necessary to analyze whether a verdict of guilty on the conspiracy charge in the first trial would have been "inconsistent" with the verdict of acquittal on the murder charge in that trial.

■ ■ A reading of the charge in the first trial shows that the court instructed the jury that it was to return a verdict of guilty or not guilty on each count of the indictment. Moreover, the court charged the elements constituting the crime of conspiracy and those elements constituting the crime of murder. In addition, the jury was instructed that it could find defendant guilty of the murder count under a theory of accessorial liability pursuant to section 20.00 of the Penal Law. If any conclusion may be reached from a reading of the charge, it is that the jury was instructed that it was to consider separate and distinct offenses, which conspiracy and the substantive crime of murder are (see *People v Epton,* 19 NY2d 496, 507-508; *People v Potwora,* 44 AD2d 207) and that it was entitled to return different verdicts on each count if it so found.[1]

■ ■ Certainly, under the facts of this case as taken from the record of the second trial, which evidence was probably

---

1. ■ The court did not charge the jury in the first trial that merely by virtue of being a member of the conspiracy, defendant would be liable for the death of John Yuhas if a coconspirator committed the murder in furtherance of the conspiracy. Such charge is referred to as the *Pinkerton* charge *(Pinkerton v United States,* 328 US 640, 645-648; *United States v Trevino,* 556 F2d 1265, 1269, n 5) and in the Federal courts a conspirator who did not participate in the actual commission of the substantive offense may not be held liable for that crime in the absence of an appropriate instruction *(United States v Trevino, supra,* p 1269, n 5). This charge is also a statement of the law of New York in that a conspirator is liable as an accomplice or principal for the criminal acts committed by her coconspirators in furtherance of the conspiracy, even if she took no part in the actual culmination *(People v Collins,* 234 NY 355; see *Shapiro v Ferrandina,* 478 F2d 894, 914, petition for cert dsmd 414 US 884). We note that defendant took no exception to the charge as given.

more compelling for conviction than that in the first trial inasmuch as the People's primary witness, Mona Yuhas, was available to testify, there is a reasonable possibility that a jury could have found defendant guilty of conspiracy and not guilty of murder. Under section 105.15 of the Penal Law, "a person is guilty of conspiracy in the first degree when, with intent that conduct constituting a class A felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct." A person cannot be convicted of conspiracy unless an overt act is alleged and proved to have been committed by one of the conspirators in furtherance of the conspiracy (Penal Law, § 105.20). Here, the jury in the first trial might have found sufficient evidence showing that defendant did agree with her coconspirators to engage in or cause the murder of John Yuhas and that an overt act, separate and apart from those acts constituting the substantive crime of murder, was committed by one of the conspirators.[2] Therefore, it would have been reasonable for the jury to return a verdict of guilty on the conspiracy charge and not guilty on the murder charge and such verdicts being logically consistent under the instructions given, retrial on the conspiracy charge under CPL 310.70, would be proper.

■■ In support of this determination is an application of the test to determine whether apparently contradictory verdicts in the same trial on two different counts of an indictment are merely inconsistent, and can stand, or are repugnant and cannot (People v Speach, 49 AD2d 210, 213; People v Bullis, 30 AD2d 470). That test states that "[c]ontradictory verdicts are merely inconsistent [and can stand] if the counts upon which they are returned, although related to one another by the facts of the case, have different basic elements (Dunn v United States, 284 US 390). However, if the two counts have the same basic elements, and a verdict of guilty is returned in one and a verdict of not guilty is returned as to the other, the verdicts are repugnant and the count upon which a conviction is returned must be dismissed" (People v Speach, supra).

---

2. There were eight overt acts alleged in the indictment and which were charged to the jury in the first trial. The jury might have found that the fact that defendant traveled from Indiana to Buffalo and took up residence with Butler was a sufficient overt act in furtherance of the conspiracy so as to find defendant guilty of conspiracy, yet insufficient to find defendant an accomplice or accessory to the murder under section 20.00 of the Penal Law.

Here, if the jury in the first trial found defendant guilty of conspiracy and not guilty of murder, such verdicts would have been permitted to stand inasmuch as the counts upon which they were returned, conspiracy and murder, although related to one another by the facts of the case, have different basic elements. Since such verdicts would have been permitted to stand if rendered at the first trial, it is contradictory to conclude that retrial on the conspiracy charge was improper.

■ Accordingly, based upon the content of the charge at the first trial and the facts of the case as taken from the record in the second trial, we find that retrial on the conspiracy count was proper.

■ Defendant secondly asserts that a new trial is necessitated by the court's error in allowing the prosecution's witness, Mona Yuhas, to bolster her testimony by reference to the fact that a polygraph examination was administered to her and that such examination showed that she was indeed telling the truth. The People submit that such occurrence was improper but argue that it constitutes harmless error. We agree.

It is well settled that evidence of the results of a polygraph examination is inadmissible in New York (Pereira v Pereira, 35 NY2d 301, 307; People v Leone, 25 NY2d 511; People v Daley, 54 AD2d 1007, 1009). Here, defense counsel objected prior to the witness' reference to the test and its results. In response to this objection the court stated that, "We do not use polygraphs as evidence."

We take issue with the statement in the dissenting opinion: "There is no evidence whatever in the record that suggests that defendant actually knew that Butler intended to murder Yuhas until a few minutes before the murder was committed." Quite to the contrary, there is overwhelming proof of defendant's guilt. This proof consists of the testimony of Mona Yuhas, who related the sequence of events leading up to the murder of her husband, as well as the details of the murder itself in which she implicates the defendant. Additionally, there are the oral and written statements made by defendant to the police, the voluntariness of which is not raised on this appeal, as well as a taped statement made by her, in which she admits to having been aware of the arrangement to kill her uncle, coming to Buffalo and living with Butler, being present at the Yuhas house during the night of the murder,

restraining Mona Yuhas from interfering with Butler while he committed the murder, cleaning up after the crime was committed, assisting Butler in transporting the victim's body and car to the Thruway and transporting Butler to a bridge where he disposed of certain incriminating evidence. In light of this evidence presented at trial, we find that there is no reasonable possibility that the witness' single reference to the polygraph test and its results might have contributed to defendant's conviction and that such error should be found harmless beyond a reasonable doubt (Chapman v California, 386 US 18, reh den 386 US 987; People v Crimmins, 36 NY2d 230, 237).

■ With respect to defendant's contention concerning the inadequacy and ineffectiveness of counsel, although it is clear that defense counsel utilized many questionable tactics throughout the trial and appeared to be unprepared in several situations, we cannot conclude that defendant was deprived of her constitutional right to counsel and a fair trial. Many of the alleged instances of counsel's inadequacy or ineffectiveness may fairly be said to have constituted trial strategy on his part or merely a ploy to gain the sympathy of the jury, particularly in those instances where counsel complained of physical illness or mental lapses. Other instances of failure to object and inadequate direct and cross-examination are errors that are commonly committed by trial counsel and easily criticizable in retrospect when they should, under many circumstances, be viewed as exercises of judgment under the pressures of a trial. We note that defense counsel in the second trial is the same attorney who represented defendant in her first trial and who succeeded in obtaining an acquittal in that trial on the murder charge. Moreover, defendant made no motion for an adjournment in order to obtain other counsel and, in fact, in no way prior to this appeal made known any dissatisfaction with her counsel (see People v Martin, 52 AD2d 988, 989). The inadequacy or ineffectiveness of defense counsel here was attributable to the quality of the proof confronting him and not to any failure in the quality of representation. It cannot be said that defendant's legal representation was so inadequate or ineffective as to render the trial a farce and a mockery of justice (People v Cossentino, 38 NY2d 760, 762). Nor may it be said that the quality of counsel's representation falls short of the standards recently announced by the Court of Appeals in People v Droz (39 NY2d 457, 462). Under the

circumstances, and in view of the overwhelming evidence of defendant's guilt, reversal is not warranted.

We have examined defendant's remaining contentions, including the assertion that her sentence was excessive, and find them to be without merit.

The judgment of conviction should be affirmed.

CARDAMONE, J. (dissenting). I dissent from the majority and believe that defendant is entitled to a new trial because she was denied the effective assistance of counsel in violation of the Sixth Amendment guarantee and because prejudicial error was committed by the trial court in admitting into evidence a reference to a successful polygraph examination of the prosecution's principal witness.

Mrs. Smith's defense to the charge of conspiracy to commit murder is that she never agreed to become part of the effort to murder the victim, did not believe anyone intended to murder him and that her participation in the clean-up and disposition of the body after the fact was induced solely out of fear for herself and her four children.

Defense counsel's conduct throughout this trial was erratic. At the very outset his pretrial preparation was inadequate. From June, 1976 when the first trial was concluded until early August, 1976 when the pretrial conference took place, counsel did nothing to prepare a motion to dismiss the conspiracy charge against defendant. In fact, counsel admitted to the trial court that he would "need at least ten days in which to get myself all organized and orientated with regard to this motion". The Trial Judge labeled the request "out of the question" and observed that counsel had "more than sufficient time to prepare".

More damaging to his client was trial counsel's examination of the police witnesses. In cross-examination of one officer, he invited that officer to state the "facts" of the case against his client. The witness then observed that "the facts as I see them are that three people traveled from Indiana to Buffalo. While in Buffalo, New York, an overt act was committed wherein Mr. Yuhas was killed". He added that the overt act consisted of "stabbing, beating and shooting". The officer admitted that his observations were not based solely upon defendant's statements, but rested in part on speculation and information acquired as part of the general police investigation of the death of Yuhas. Counsel also asked for the officer's legal

opinion concerning the duration of the conspiracy. He repeatedly asked extremely broad questions and then objected that the witness was not responsive when he gave an appropriately broad answer. When counsel complained that the witness was basing his testimony on hearsay, the trial court remarked that "the point is, you asked him a quesiton as to what he did consider part of a conspiracy and he is telling you". At another point, counsel propounded a question concerning defendant's statements regarding her participation in the conspiracy and commented that "that is a very general question, so answer to your heart's content". The same witness proceeded to summarize the evidence against defendant and made several observations which seemed to come as a surprise to counsel. Indeed, it appeared that counsel was not even fully familiar with the contents of his client's written statement to the police. After counsel's return to the courtroom, following a fall in which he was injured, he was unable to argue effectively in favor of the exclusion of her recorded statement. When questioned by the trial court concerning a case which he had cited to it in support of his objection to the admission of his client's statement, counsel commented that "that was just a wild stab. I didn't get an opportunity to read it. I wanted to call it to your attention and that is it. I didn't read the opinion, so I can't properly argue that it is on the nose, that it might even be pertinent".

Counsel also clearly blundered when, despite his efforts to show that defendant's confessions were involuntary, he permitted another police witness to ask him: "Counselor, did you hear anyplace in that tape where her rights were violated?" Incredibly, counsel responded: "No, I don't remember. * * * No, no, I am not saying that you violated anybody's rights, Mr. Gibbons." The police witness thanked defense counsel and then added, "You had better not."

The foregoing exchange seriously impaired counsel's efforts to persuade the jury that his client's statement was not a product of her free will. It also illustrates counsel's total lack of preparation and control in cross-examining police witnesses.

Another shocking example of counsel's ineptitude took place when he announced in the presence of the jury that defendant had an arrest record as a juvenile. Counsel had heard that the prosecution intended to introduce an unspecified arrest record regarding the defendant (later revealed to be the record of her arrest on the crime for which she was then being tried), and

he exclaimed that "if * * * the district attorney sees fit to introduce a juvenile arrest record by Mrs. Smith, I am going to object". This comment on those records in the presence of the jury was inexcusable and certainly prejudicial since it is improper to introduce defendant's record as a juvenile delinquent in an attempt to attack credibility (Family Ct Act, § 783; see *People v Droz,* 39 NY2d 457, 460).

It has been held that before a conviction will be overturned on the ground that the defendant was denied effective assistance of counsel, the attorney's conduct must be so ineffective as to make the proceedings a "mockery of justice" (see, e.g., *People v Tomaselli,* 7 NY2d 350, 354; *People v Jones,* 30 AD2d 1038, mod 31 AD2d 780, affd 25 NY2d 637). This standard fails to set forth any of the elements of effective representation and has been widely criticized as not affording defendants sufficient protection from incompetent counsel (e.g., Rothblatt, Ineffective Assistance of Counsel, NYLJ, May 28, 1976, p 2, col 1; Finer, Ineffective Assistance of Counsel, 58 Cornell L Rev 1077; Bazelon, The Defective Assistance of Counsel, 42 U Cin L Rev 1, 28 [commenting that the test "requires such a minimal level of performance from counsel that it is itself a mockery of the sixth amendment"]; Note, Ineffective Representation as a Basis for Relief from Conviction: Principles For Appellate Review, 13 Col J of Law and Social Problems 1, 32-37). However, in *People v Droz (supra,* p 462), the Court of Appeals has articulated more specific factors to be taken into consideration in determining whether a criminal defendant has received effective assistance of counsel: "it is elementary that the right to effective representation includes the right to assistance by an attorney who has taken the time to review and prepare both the law and facts relevant to the defense and [citations omitted] and who is familiar with, and able to employ at trial basic principles of criminal law and procedure [citations omitted]. Whether counsel has adequately performed these functions is necessarily a question of degree, in which cumulative errors particularly on basic points essential to the defense, are often found to be determinative".

In recent years more has been demanded of counsel than is generally associated with the "farce and mockery" test as it is applied in other jurisdictions and as it was formerly known in New York *(People v Bennett,* 29 NY2d 462; see, Note, 13 Col J of Law and Social Problems, pp 28-30). In fact, there appears little difference between the test of competence articulated in

*Droz* and that now applied in other jurisdictions which have adopted the so-called "reasonable lawyer" test. The standards for reasonably competent counsel require that counsel must conduct appropriate investigations, both factual and legal, to determine whether matters of defense can be developed and to allow himself enough time for reflection and preparation for trial *(Coles v Peyton,* 389 F2d 224, 226). The exercise of the utmost courtroom skill is not enough if counsel has neglected the necessary investigation and preparation of the case or failed to interview essential witnesses or to arrange for their attendance. Adequate legal research is also essential *(United States v De Coster,* 487 F2d 1197; *Moore v United States,* 432 F2d 730). Finally, it is not enough that counsel has adequately prepared and thus is capable of rendering effective assistance; he must also actually display at trial a familiarity with basic principles of criminal law and procedure *(People v Droz,* 39 NY2d 456, 462, *supra).*

Counsel in this trial manifested an inexcusable lack of preparation on important legal issues, a harmful inability to control the testimony of adverse witnesses, a lack of familiarity with the nature of admissions made by his own client, a facility for unnecessarily bringing to the jury's attention detrimental information which would not otherwise have been elicited, and an unwarranted inclination to make damaging concessions in response to questions propounded by prosecution witnesses. While it may not be possible to find that any one of the specified acts or omissions in the conduct of the trial would, standing alone, constitute ineffective assistance of counsel, the totality of the omissions and errors compels the conclusion that counsel's performance deprived defendant of her right to effective assistance of counsel as mandated by the Sixth Amendment to the Constitution.

Turning next to the effect that the results of the "lie detector" test had on the outcome of the trial, it is necessary in order properly to assess the impact of this testimony to discuss briefly the evidence leading to defendant's conviction as a conspirator in the murder of John Yuhas. There is no direct evidence that defendant agreed to participate in such a scheme; rather, the evidence supporting the verdict is entirely circumstantial. In brief, the prosecution proved that defendant heard of a proposal made by Mrs. Pounds to have Yuhas killed. Defendant later moved from her home in Indiana to Buffalo, New York, where Yuhas lived. The evidence is con-

flicting on the question of whether defendant restrained Mrs. Yuhas during the killing of her husband. Finally, concededly, defendant assisted Butler in the cleanup of the murder scene and in disposing of the evidence. The critical question is whether these events of this conduct constitute overwhelming proof, as the majority finds, that defendant was a participant in a conspiracy to murder John Yuhas.

Defendant took the stand and offered an explanation for her conduct which is inconsistent with the view that she was actuated by a desire to see John Yuhas killed. In both her recorded statements to the police and in her testimony at trial, she acknowledges an awareness of Mrs. Pounds' proposal to have Yuhas murdered, but declares that she did not take the proposal seriously. Defendant attributed the scheme to her grandmother's senile condition and said that Mrs. Pounds always threatened to throw someone out of the house and expressed a desire to see all of her daughters' husbands killed so that all her daughters could return to live with her. Defendant's belief that the murder plot was frivolous was shared by others. Thus, for example, when Mona Yuhas told Clayton Pounds, Jr., of the scheme, he replied that Mrs. Pounds and John Yuhas were always arguing "so don't believe they are actually going to do it". When defendant questioned Butler about the proposal, Butler assured her that he had no intention of killing anyone. Thereafter, defendant testified that she heard nothing further about it. Again in her recorded statement to the police, defendant said that she did not move to Buffalo in order to kill Yuhas. At trial she testified that she left Indiana to escape harassment by her ex-husband. In all of her statements and testimony defendant said that she was not aware that Butler intended to murder Yuhas when they visited the Yuhas home on the night of the murder. There is no evidence whatever in the record that suggests that defendant actually knew that Butler intended to murder Yuhas until a few moments before the murder was committed.

Defendant told the police that she ran upstairs and re-strained Mrs. Yuhas in her room after Butler had begun to beat Yuhas. Mrs. Yuhas testified that defendant restrained her at the time, but she also stated that the defendant said "Aunt Mona, don't get out of bed, and shut up and don't holler" because "everybody else in the house would be killed." Defendant also admits that she assisted in cleaning up the murder scene and disposing of Yuhas' body but she claims

that she did so only out of fear of Butler. According to the defendant Butler emerged from Yuhas' room, threatened her and said "Clean up or you are going to be next." She said that if she did not keep quiet, he would "burn" her and kill her children. This version finds some support from various police witnesses who testified that defendant evaded their questions until she was assured that her children would be protected from Butler. Defendant also detailed a pattern of Butler's violent actions toward her and her children. Further, Mrs. Yuhas also testified that she initially lied to the police out of fear for her own life and the lives of members of her family.

It is within this context that Mrs. Yuhas was asked whether she was polygraphed and responded, after a series of questions and over objection, that she was and "it came out that I was telling the truth." Evidence of the results of a polygraph examination is not admissible in New York *(Pereira v Pereira,* 35 NY2d 301, 307; *People v Leone,* 25 NY2d 511; *Matter of Sowa v Looney,* 23 NY2d 329, 334). In other jurisdictions courts have held that where a prosecution witness volunteers that he or she has taken a polygraphic examination, a reversal is not required so long as no reference is made to the results of that test (see, e.g., *Gafford v State,* 440 P2d 405 [Alaska], cert den 393 US 1120; *Johnson v State,* 166 So 2d 798, 805 [Fla]; *People v Martin,* 62 Ill App 2d 203, affd 35 Ill 2d 289). Even where the results are revealed, no reversal will be ordered if appropriate curative instructions are given *(Eckert v Nevada,* 91 Nev 183). However, where the results of the witness' polygraphic examination are revealed over the objection of defense counsel, and no curative instructions are given, prejudicial error has been found *(Mattox v State,* 240 Miss 544; *State ex rel. Harris v Schmidt,* 69 Wis 2d 668; see, also, *People v Neumuller,* 29 AD2d 886; cf. *People v Dobler,* 29 Misc 2d 481; *People v McCain,* 42 AD2d 866).

The majority concede the error but hold it harmless. I disagree. An error of nonconstitutional dimensions is deemed prejudicial and requires reversal unless the proof of defendant's guilt, without reference to the error, is overwhelming *(People v Crimmins,* 36 NY2d 230, 241-242). Even where, as here, the court concludes that the proof without the error is overwhelming, there must be a reversal where there is a significant probability that the jury would have acquitted the defendant had it not been for the error or errors which occurred. In my view, the People's proof, which consisted

almost entirely of circumstantial evidence, falls far short of overwhelming and presents instead a close question of fact. An error cannot be other than prejudical where the prosecution's principal witness was permitted to testify that she "was telling the truth" according to the "lie detector" test, thereby bolstering the testimony of the primary witness upon which the jury verdict was based; particularly here where the trial court failed to give curative instructions. The significance of Mrs. Yuhas' testimony becomes readily apparent when it is remembered that in defendant's first trial, in which Mrs. Yuhas did not testify, the jury was unable to reach a decision on the question of defendant's participation in the conspiracy and in fact acquitted defendant of the murder charge.

Accordingly, I dissent and vote to reverse the judgment of conviction and grant the defendant a new trial.

SIMONS, HANCOCK, JR., and DENMAN, JJ., concur with MOULE, J. P.; CARDAMONE, J., dissents and votes to reverse judgment and grant a new trial, in an opinion.

Judgment affirmed.