Chief Judge Kaye
(concurring). We conclude that it was
error to admit the DNA bloodstain analysis evidence in this case. We nevertheless agree that defendant’s conviction should be affirmed, because that evidence comprised only a minor part of the People’s case. Although the result is unaffected, we write separately out of concern, for future cases, that the principles governing admission of novel scientific evidence be correctly articulated and applied.
Lest we add to rather than ameliorate confusion, we begin by stating points on which the Court is unanimous.
The Court agrees unanimously that where the scientific evidence sought to be presented is novel, the test is that articulated in Frye v United States (293 F 1013, 1014), in essence whether there is general acceptance in the relevant scientific community that a technique or procedure is capable of being performed reliably (People v Middleton, 54 NY2d 42, 49).[1] In the present case, such an inquiry required assessment of whether the technique employed in forensic DNA analysis had gained scientific acceptance — that is, whether the six steps of the Restriction Fragment Length Polymorphic (RFLP) procedure, the procedure for declaring that two samples of DNA were identical (step seven), and assessment of the significance of a "match” (step eight) were generally accepted as reliable by experts in the field.
The Court is unanimous, moreover, in concluding that three *436 inquiries are involved in the consideration of novel scientific evidence. The first — the Frye hearing — asks whether, theoretically, the accepted techniques, when performed as they should be, generate results generally accepted as reliable within the scientific community. Once a scientific procedure has been proved reliable, a Frye inquiry need not be conducted each time such evidence is offered. Courts thereafter may take judicial notice of reliability of the general procedure.
Next, a foundational inquiry must be satisfied before such evidence is placed before the jury: in each case the court must determine that the laboratory actually employed the accepted techniques. This foundational inquiry also goes to admissibility of the evidence, not simply its weight (People v Middleton, 54 NY2d, at 45, 50, supra)[2] Finally, infirmities in collection and analysis of the evidence not affecting its trustworthiness go to weight, to be assessed by the jury.[3]
Where we part company with our colleagues is in the application of these principles. We do not agree that the eight steps of forensic analysis, then in its infancy, were shown to have been accepted as reliable within the scientific community. Rather, the standard for general acceptance of the new techniques was seen as commensurate with the standards adopted by Lifecodes, the commercial laboratory hired to conduct the actual tests and which virtually occupied the field of forensic DNA analysis. Additionally, the hearing court made very clear to the parties in its Frye decision that it *437 considered only the theory of forensic DNA analysis as going to admissibility, and relegated the remaining questions for weighing by the jury, including such foundational inquiries as whether Lifecodes’ methodology and procedures were adequate to assure the reliability and accuracy of the results (140 Misc 2d 306, 317; see also, 183 AD2d 75, 78). In our view admission of this evidence was error.
The Frye Hearing in this Case
The Frye hearing in this case was virtually the first in the Nation to consider whether forensic application of DNA analysis had been generally accepted as reliable. While the mere fact that a court is the first to evaluate novel scientific evidence does not mean the evidence is unreliable, it increases the task of the hearing court. If no court opinions, texts, laboratory standards or scholarly articles have been issued on the technique — the types of materials relevant to a determination of general acceptability (Matter of Lahey v Kelly, 71 NY2d 135, 144; People v Middleton, 54 NY2d 42, 50, supra; People v Leone, 25 NY2d 511, 516-517; People v Magri, 3 NY2d 562) — the court may, as it did here, take the testimony of expert witnesses.[4]
The People offered detailed testimony concerning the RFLP procedure — an accepted procedure for separating strands of DNA and locating their unique fragments — which had been in use for research and diagnostic purposes long before its forensic application was proposed. Dr. Kenneth Kidd and Dr. Richard Roberts, experts in molecular biology and population genetics, and Dr. Sandra Nierzwicki-Bauer, a molecular biologist specializing in the study of blue-green algae, vouched on *438 behalf of the People for the reliability of RFLP procedure. None of these witnesses, however, was expert in forensic DNA analysis.
In defining the relevant scientific field, the court must seek to comply with the Frye objective of containing a consensus of the scientific community. If the field is too narrowly defined, the judgment of the scientific community will devolve into the opinion of a few experts. The field must still include scientists who would be expected to be familiar with the particular use of the evidence at issue, however, whether through actual or theoretical research (Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later, 80 Colum L Rev 1197, 1209-1210).
Focusing on DNA profiling in the forensic setting is crucial because "DNA fingerprinting is far more technically demanding than DNA diagnostics,” particularly in the art of declaring a "match” between samples (Lander, DNA Fingerprinting on Trial, 339 Nature 501). Traditional RFLP procedure was developed to enable scientists to identify the DNA structure contained within a particular sample, and had been in use for more than a decade at the time of this hearing. Its forensic application — comparison of DNA between two or more samples, one from an unknown source — is far more susceptible to error (id.). Techniques must be adapted to the special requirements of crime scene samples, which are subject to contamination that can confuse results. Moreover, steps seven and eight —the steps unique to forensic analysis of DNA — were truly novel.
The theoretical use of DNA profiling as a method for identifying perpetrators of crimes was first posited in 1985 in a series of articles by British researchers (Jeffreys, Wilson and Them, Hypervariable Minisatellite Regions in Human DNA, 314 Nature 67-69; Jeffreys, Wilson and Thein, Individual-Specific "Fingerprints” of Human DNA, 316 Nature 76; Gill, Jeffreys and Werrett, Forensic Application of DNA Fingerprints'\ 318 Nature 577). By 1988, the only practitioners of the technique in this country were the commercial laboratories Cellmark (founded by Dr. Jeffreys), Cetus and Lifecodes, which began forensic analysis just one year before the hearing in this case. Little peer review of their techniques had taken place by 1988 because these enterprises endeavored to keep their methods secret to protect their proprietary interests. According to the defense witness Dr. Neville Colman, the *439 procedures were still so new that there had not yet been efforts in the field to "validate by replication” the methods employed at Lifecodes; there had been neither refutation nor support of the technique in the professional literature.[5]
The point of noting controversy about the reliability of the forensic technique is not for our Court to determine whether the method was or was not reliable in 1988, but whether there was consensus in the scientific community as to its reliability. The Frye test emphasizes "counting scientists’ votes, rather than on verifying the soundness of a scientific conclusion.” (Jones v United States, 548 A2d 35, 42 [DC Ct App]; accord, State v Montalbo, 73 Haw 130, 828 P2d 1274, 1279.) Where controversy rages, a court may conclude that no consensus has been reached. Here, however, the problem was more subtle: absence of controversy reflected not the endorsement perceived by our colleagues, but the prematurity of admitting this evidence. Insufficient time had passed for competing points of view to emerge.[6]
The inquiry into forensic analysis of DNA in this case also demonstrates the "pitfalls of self-validation by a small group” (Hoeffel, The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant, 42 Stan L Rev 465, 502, citing Black, A Unified Theory of Scientific Evidence, 56 Fordham L Rev 595, 625). Before bringing novel evidence to court, proponents of new techniques must subject their methods to the scrutiny of fellow scientists, unimpeded by commercial concerns (Thompson, Evaluating the Admissibility of New Genetic Identification Tests: Lessons From the "DNA War” 84 Crim L & Criminology 22, 95).
*440 A Frye court should be particularly cautious when — as here —"the supporting research is conducted by someone with a professional or commercial interest in the technique” (Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later, 80 Colum L Rev 1197, 1213). DNA forensic analysis was developed in commercial laboratories under conditions of secrecy, preventing emergence of independent views. No independent academic or governmental laboratories were publishing studies concerning forensic use of DNA profiling. The Federal Bureau of Investigation did not consider use of the technique until 1989. Because no other facilities were apparently conducting research in the field, the commercial laboratory’s unchallenged endorsement of the reliability of its own techniques was accepted by the hearing court as sufficient to represent acceptance of the technique by scientists generally. The sole forensic witness at the hearing in this case was Dr. Michael Baird, Director of Forensics at Lifecodes laboratory, where the samples were to be analyzed. While he assured the court of the reliability of the forensic application of DNA, virtually the sole publications on forensic use of DNA were his own or those of Dr. Jeffreys, the founder of Cellmark, one of Life-codes’ competitors. Nor had the forensic procedure been subjected to thorough peer review.
The absence of agreed-upon standards and laboratory protocol for the conduct of a technique can also serve to establish that the technique has not yet gained general acceptance (People v Leone, 25 NY2d 511, supra). Here, no laboratory conducting DNA analysis had been accredited for that purpose. As early as 1984, the Legislature set standards, in the Family Court Act, for admissibility of blood genetic marker tests. Analysis of DNA samples considered on the question of paternity — where laboratories must also declare that two samples "match” — must be shown to have been performed in accordance with proper procedures by a laboratory authorized by the Commissioner of Health to conduct such tests (Family Ct Act §§ 418, 532). As of July 1992, however, no laboratory, including Lifecodes, had yet been authorized by the Commissioner of Health to conduct DNA testing (Matter of S.L.B. v K.A., 155 Misc 2d 458, 459). The defense introduced testimony from Dr. Anne Willey of the Department of Health establishing that no licensing or certification standards governing DNA profiling evidence had yet been developed in New York State, although discussions were ongoing. Lifecodes was licensed only *441 to conduct genetic tests of amniotic fluid. As defendant pointed out to the hearing court, the evidence proffered against him to prove murder would not have been admissible in this State on the question of paternity.
The opinions of two scientists, both with commercial interests in the work under consideration and both the primary developers and proponents of the technique, were insufficient to establish "general acceptance” in the scientific field (People v Leone, 25 NY2d 511, 514, supra). The People’s effort to gain a consensus by having their own witnesses "peer review” the relevant studies in time to return to court with supporting testimony was hardly an appropriate substitute for the thoughtful exchange of ideas in an unbiased scientific community envisioned by Frye. Our colleagues’ characterization of a dearth of publications on this novel technique as the equivalent of unanimous endorsement of its reliability ignores the plain reality that this technique was not yet being discussed and tested in the scientific community.[7]
The hearing court also erred in failing to scrutinize the seventh and eighth steps of forensic DNA analysis pursuant to Frye standards. Our colleagues obscure this shortcoming by focusing on the wealth of evidence establishing the reliability of the first six steps of forensic analysis (the RFLP procedure) —a question that was not even disputed at the hearing. It is the absence of evidence concerning accepted standards for steps seven and eight that compels me to conclude admission of this evidence was error.
It is the declaration of a match between two samples of DNA, depicted on two separate autorads, that distinguishes forensic use of DNA from traditional, research-based application of RFLP procedure. The only evidence offered on this point was, again, the testimony of Dr. Michael Baird, who *442 testified as to how a Lifecodes technician would visually compare the bands on two autorads to determine if they were the same. During the testimony of Dr. Borowsky, the court had the following exchange with the District Attorney:
"Let me ask you this. Let’s just keep on this field. Is there some person who looks at the autorad, gentlemen, and says 'All right, this is included, this one is not included?’ or is the autorad read by computer or some kind of machine?
"district attorney: It’s read by a person.
"the court: It’s read by a person?
"district attorney: Yes.
"the court: All right. And a person with what expertise?
"district attorney: Well, Dr. Balasz from Life-codes, who’s a Ph.D., he has read the auto[rads].”
The People presented no evidence as to whether this was the procedure generally accepted as reliable in determining whether two DNA samples match beyond Dr. Baird’s broad assertion that it was. Given the testimony from Dr. Borowsky indicating that autorad readings could lead to highly subjective results, it cannot be said that the People met their burden of clearly establishing that there were generally accepted procedures for "reading” autorads in the scientific community.
Moreover, we can take note that the "visual” matching technique was rejected as unreliable once it came to the attention of neutral peers in the scientific community (National Research Council, DNA Technology in Forensic Science ["NRC Report”] § 2.3.5).[8] We now know that "visual matches” *443 must be confirmed by a computerized measurement of the apparently matching bands. Only if these bands fall within certain defined parameters, called a "match window,” will a match be declared (Attorney-General’s amicus brief, at 20). Moreover, band appearance and position may be altered by testing conditions, environmental factors or sample contamination, compelling scientists to employ a wide "latitude of acceptance” to account for discrepancies between prints and to permit declaration of a match even where bands are not identical. This creates a danger that DNA prints of different individuals will be mistakenly declared to match, and no formal standards existed for declaring a match in 1988 (Thompson and Ford, DNA Typing: Acceptance and Weight of the New Genetic Identification Techniques, 75 Va L Rev 45, 87-89 [1989]).
The People’s failure to adduce evidence on the matching standards was pointed out by the defense at the hearing. In the course of examining Lifecodes’ methods for assessing the statistical significance of a match, the defense witness Dr. Richard Borowsky, a population geneticist, repeatedly questioned the criteria employed by Lifecodes for determining that two autorads "matched.” Defense counsel emphasized that "the way they read” autorads raises issues relevant to the reliability of the testing and that a negative result "may be just a matter of interpretation.” Dr. Borowsky specifically cautioned that "the probability of error” in evaluating the frequency with which a particular gene will appear on an autorad band "has not been evaluated by the scientific community,” and declared that "interpretation is as much as part of the print test as the molecular biology.”
Our colleagues’ conclusion that the reliability of the procedures employed in the instant case had been satisfactorily established overlooks that the samples had not been tested at the time of the Frye hearing, and the autoradiographs never examined prior to their admission at trial. Establishing a proper foundation requires at a minimum a determination that the autoradiographs were of a quality susceptible to interpretation (People v Castro, 144 Misc 2d 956, 967, 973-979), an inquiry that was here foreclosed by the court’s erroneous determination in its Frye decision that all questions as to how a sample was tested go to weight, not admissibility.
Defendant also challenged the reliability of step eight, application of statistical methods to determine the significance *444 of a "match.” In its written decision, the court summarized what it saw as part of "[t]he defense attack”: "that Lifecodes’ population studies are inadequate to establish a claimed power of identity for its results under the laws of population genetics” (140 Misc 2d, at 317). Dr. Borowsky sought to evaluate independently the autorads which comprised the population genetics database, warning that the absence of standards in the field led to subjective results.
Step eight is an integral part of DNA forensic analysis. Indeed, evidence of a "match” is virtually meaningless without resort to the statistical interpretation; population genetics is arguably the most crucial step of the analysis. It is the area of greatest controversy among the experts.[9] Whether the statistical technique employed by the laboratory meets the standards in the field and is capable of producing reliable results goes directly to admissibility. The hearing court erroneously characterized these concerns as affecting only the weight of the population genetics evidence.
We therefore conclude that the court erred in holding that DNA forensic analysis was generally accepted as reliable in 1988.
Harmless Error
Because of the overwhelming evidence of defendant’s guilt, we join in affirming defendant’s conviction in this instance where it can fairly be said that use of DNA evidence was harmless beyond a reasonable doubt (People v Crimmins, 36 NY2d 230, 237). At the time the People raised the possibility of introducing DNA evidence, they apparently hoped tests would establish that semen found on the body of the deceased originated from defendant, establishing his guilt of her sexual assault. It is unclear why the court instigated a Frye hearing *445 before these tests had even been conducted, for it turned out that the DNA tests on the semen sample were inconclusive. While evidence concerning the source of the semen would have been probative, it never materialized and was not introduced at trial.
Instead, the People presented evidence that DNA contained in blood found on defendant’s shirt matched that of the deceased and was not defendant’s. This evidence added nothing to the People’s case, however, since defendant admitted that he had been at the deceased’s apartment at the time of her death and touched her body, albeit in an attempt to revive her (majority opn, at 421). Moreover, independent forensic analysis of fibers found at the crime scene also established that defendant had been present at the apartment. The DNA evidence, therefore, was simply cumulative on this point, as both parties acknowledged on summation:
"[defendant’s lawyer]: What does [the DNA evidence] establish? That Helen Kendrick’s blood was on George Wesley’s T-shirt. That’s all it establishes. It establishes nothing else. What it establishes is exactly what George Wesley admitted, that he was there. * * *
"[district attorney]: In this case, as it turns out, [the DNA evidence’s] significance is perhaps less than we anticipated, because it’s unquestioned that the victim’s blood is on the defendant’s clothing.”
Future Use of Forensic DNA Analysis
We join our colleagues in concluding that RFLP-based forensic analysis is today generally accepted as reliable. We know that, in principle, DNA polymorphisms provide a reliable method of comparing samples, that other than identical twins, each person has unique DNA, and that the current laboratory procedures for detecting DNA sequence variations are fundamentally sound. While the general acceptability of these techniques is no longer an open question, and trial courts may take judicial notice of their reliability, the adequacy of the methods used to acquire and analyze samples must be resolved case by case. As new forensic procedures are developed, Frye hearings will have to be conducted to assess the reliability of those methods.
The NEC panel called for formal quality-control programs *446 in all laboratories, called on Congress to require external accreditation and proficiency testing of laboratories by a governmental body, and recommended the establishment of a National Committee on Forensic DNA Typing to provide scientific and technical advice on new methods of DNA typing and related issues as they arise (Annas, Setting Standards for the Use of DNA-Typing Results in the Courtroom — The State of the Art, 326 N Eng J of Med 1641, 1642). Such a call is a useful reminder, even in 1994. As the NRC recommended:
"[fjorensic DNA analysis should be governed by the highest standards of scientific rigor in analysis and interpretation. Such high standards are appropriate for two reasons: the probative power of DNA typing can be so great that it can outweigh all other evidence in a trial; and the procedures for DNA typing are complex, and judges and juries cannot properly weigh and evaluate conclusions based on differing standards of rigor.” (NRC § 2.1.)
Accordingly, we would affirm defendant’s conviction, but only because, in the unusual circumstances of this case, the erroneous admission of the DNA evidence was harmless beyond a reasonable doubt.
Judges Simons and Bellacosa concur with Judge Smith; Chief Judge Kaye concurs in result in a separate opinion in which Judge Ciparick concurs; Judges Titone and Levine taking no part.
Order affirmed.

. Even the new Federal test articulated in Daubert v Merrell Dow Pharms. (509 US —, 113 S Ct 2786) would require proof of reliability of novel scientific evidence.

. We disagree with the conclusion of the court in People v Castro (144 Misc 2d 956, 959) that the foundational inquiry is part of a special "DNA Frye test.” Our cases have always required a foundational inquiry before scientific evidence can be admitted (see, e.g., People v Middleton, 54 NY2d, at 45, supra), even after a particular technique has passed out of the "twilight zone” of "novel” evidence that is the subject of Frye and is judicially noticed as reliable (see, People v Knight, 72 NY2d 481, 487 [radar speed detection]; People v Campbell, 73 NY2d 481, 485 [blood alcohol content test]; People v Mertz, 68 NY2d 136, 148 [same]; People v Freeland, 68 NY2d 699, 701 [same]; Pereira v Pereira, 35 NY2d 301, 307 [polygraph test used for investigative purposes]). While the Frye hearing and foundational inquiry may proceed simultaneously, in the present case the Frye inquiry was conducted before any samples were taken, so that a foundational inquiry was not possible at that time.

. Brief gaps in the chain of custody, for example, may not affect trustworthiness of the test results, while challenges to the forensic laboratory analysis may go to the heart of reliability of results and require preclusion (Imwinkelreid, The Debate in the DNA Cases Over the Foundation for the Admission of Scientific Evidence: The Importance of Human Error as a Cause of Forensic Misanalysis, 69 Wash U LQ 19, 27).

. It is not for a court to take pioneering risks on promising new scientific techniques, because premature admission both prejudices litigants and short-circuits debate necessary to determination of the accuracy of a technique. Premature acceptance of "revolutionary” forensic techniques has led to wrongful conviction (see, Giannelli, The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later, 80 Colum L Rev 1197, 1224-1225 [discussing belated discovery of inaccuracy of paraffin test]; Neufeld and Colman, When Science Takes the Witness Stand, 262 [No. 5] Scientific Am 46 [discussing belated discovery of inaccuracy of gunpowder detection test]). In People v Leone (25 NY2d 511, 517-518, supra) we also warned against introduction of scientific evidence before its general reliability have been resolved in the scientific community, because " 'the value of tbe test * * * could easily become the question in the trial rather than that person’s guilt or credibility’ ” (quoting People v Davis, 343 Mich 348, 372, 72 NW2d 269, 282). Surely this case is an example of such diversion of focus.

. The earliest law review study of forensic DNA profiling, however, completed about the same time as the decision on the suppression motion in this case, warned that "[u]nforeseen exceptions to the test’s reliability are already beginning to surface” and that it was not yet ready for Frye scrutiny, citing concerns raised by Dr. Alec Jeffreys himself (Burk, DNA Fingerprinting: Possibilities and Pitfalls of a New Technique, 28 Jurimetrics 455, 468, 470, n 68 [summer 1988]).

. In the six years between the Frye hearing in this case and our review of it, debate within the scientific community has exploded about forensic application of DNA analysis. In New York, the Governor’s Panel on Forensic DNA Analysis issued an interim report in September 1989 (Poklemba Report) with recommendations for a model program. No final recommendations have yet been issued. In April 1992, the National Research Council (NRC) issued its report, DNA Technology in Forensic Science, initiated in January 1990. In fall 1993, the NRC announced its intention to issue an amended report with modified recommendations.

. While DNA evidence had been admitted in some criminal cases by mid-1988, the defense in this case was the very first to "mount * * * a serious challenge to DNA typing” (Thompson and Ford, DNA Typing: Acceptance and Weight of the New Genetic Identification Tests, 75 Va L Rev 45, 46, n 4). Contrary to the observations of our colleagues, therefore (majority opn, at 426), the fact that Lifecodes DNA evidence had been admitted without objection prior to the time of the hearing in this case was of little significance. This is particularly so since Dr. Michael Baird was also the witness vouching for the reliability of the unopposed Lifecodes evidence in those cases as well (Thompson and Ford, op. cit., 75 Va L Rev 45, 49, n 20). The mere fact that the same assertions he made here had been repeated elsewhere — without challenge — did not render those statements more reliable.

. Because the question of admissibility of novel evidence is one of law, our determination on appeal should acknowledge when subsequent developments have cast doubt upon the result of the Frye hearing (see, e.g., People v Hughes, 59 NY2d 523, 543; People v Taylor, 75 NY2d 277; People v Williams, 6 NY2d 18, 26; People v Magri, 3 NY2d 562, 566). Defendant unsuccessfully brought a motion pursuant to CPL 440.10 (1) (g) to vacate the conviction on April 18, 1990, alleging that the technique for declaring a "match” employed in 1988 had been proven unreliable. Indeed, the slip opinion — relying on 1990 and 1993 texts describes step seven as including both visual studies and computer imaging analysis. No such evidence was before the hearing court when it passed on the techniques at issue; it dispensed with this crucial phase of determining that an autoradiograph is suitable for analysis, and that two samples match, in just one sentence: "When comparing two DNA fragment patterns * * * one simply looks to see where the probe 'landed’ ” (140 Misc 2d 306, 317).

. Some jurisdictions have barred DNA evidence altogether because of the uncertainty of the statistical significance of a match (Commonwealth v Curnin, 409 Mass 218, 565 NE2d 440, 443; Ex parte Perry, 586 So 2d 242, 254 [Ala]; People v Barney, 8 Cal App 4th 798, 10 Cal Rptr 2d 731, 742). Others have simply barred any statistical evidence of a match, while allowing testimony that the DNA test did not exclude the defendant as a suspect (Prater v State, 307 Ark 180, 820 SW2d 429; State v Bible, 175 Ariz 549, 858 P2d 1152; State v Pennell, 584 A2d 513 [Del]; State v Schwartz, 447 NW2d 422 [Minn]; State v Houser, 241 Neb 525, 490 NW2d 168; State v Vandebogart, 136 NH 365, 616 A2d 483; State v Anderson, 115 NM 433, 853 P2d 135; Rivera v State, 840 P2d 933 [Wyo]; United States v Porter, 618 A2d 629 [DC Ct App]).