Julian R. Hanley, J.
This paternity proceeding was brought by the Commissioner of Social Services on behalf of the mother who was on welfare. The child was born in May of 1970.
At the pretrial conference, the respondent took the position that the mother had had sexual relations with other men besides the respondent during the period of conception. The mother denied this. The court then ordered a lie detector test of the parties. The order provided that the test results should be given to the parties and their counsel, but not to the court.
At the trial the mother testified. The respondent did not take the stand (Family Ct. Act, § 531).
She testified that the time of conception was August of 1969. That she had had sexual relations with respondent during this period, particularly on one weekend in August when she and the respondent went away on a trip together'.
She testified flatly, both to counsel and to the court, that she had had no sexual relations with any other man but the respondent from July to September of 1969, the period in which she had become pregnant.
The respondent then made an offer of. proof, offering the results of the petitioner’s lie detector examination in evidence. Petitioner’s counsel objected.
A hearing was then had on the advisability of admitting lie detector results in evidence.
John J. Ginty, Administrator-Clerk of the Niagara County Family Court, was sworn as a witness. He testified that he had been Family Court Clerk for over 10 years. That in an average year Family Court here would have 350 paternity proceedings started, about ,a new case every day. That as of October 1, this year, there were 184 paternity cases waiting trial in Niagara County alone.
He further testified that, at present, there was no other court-recognized means except .a blood test, available to test a disputed *721 claim of parentage. A blood test requires that the child be six months of age. So, if a pregnant mother signs a paternity petition, there is a built-in delay time of up to a year or more before there can be a trial. Also, the scheduling of such a large number of blood tests is such that ,at the present time in Niagara County if the parties were ready for a blood test today, the test itself could not be scheduled to be taken until 1973.
This, he testified, with other delays for cause, often results in the paternity trial itself not being held until the child is from one to five years old.
Meanwhile, while the case remains unheard, either Social Services or the mother herself must support the child. The county’s records show that the cost to Social Services to maintain a mother and an illegitimate child for one year amounts to $5,000, with the cost of delivery adding from $500 to $1,000 more to the total. The respondent pays nothing during this time because his case has not even been brought on for trial.
Aside from this, the blood test results actually prove to be of little or no protection to the putative father. The clerk’s testimony was that in his 10-year experience in Family Court, he only knew of one case where the father was actually excluded as a result of a blood test. All others simply resulted in a delay.
' The next witness was John Cole, the lie detector examiner for Niagara County. He testified that he was an experienced polygraph operator having been graduated from the Keeler Institute in Chicago that teaches the operation of this machine. That he had been active, first as examiner for Niagara County for five years, and then that he had conducted his own business as a polygraph operator examining people for private industry. That he again had become the official examiner for Niagara County and was a Deputy Sheriff there. That during the 12 years’ experience he had had as a polygraph operator he had given over 15,000 examinations.
He explained the operation of the polygraph. How, as you were being questioned, the machine was connected to your body, measuring your bodily reactions, such as heart beat, respiration and skin moisture. These are recorded separately on a graph. That your body unconsciously responded when you were not telling the truth. Further, that it did require a trained and experienced operator to properly interpret the results of the polygraph examination. He further testified that the polygraph was not infallible, but that in his experience in giving over 15,000 tests, he found only 20 cases in which he had proven to *722 be wrong. He then testified that, pursuant to this court’s order, he had given a polygraph test to the mother just a week before this trial.
The respondent then offered the results of her test in evidence. Counsel for petitioner objected. The court and all concerned, were fully aware of the fact that lie detector results have never been allowed in evidence before in courts of this State.
The court then ruled that the test results were admitted in evidence and were to be received, not as direct proof of the fact, but only on the question of the credibility of petitioner.
The examiner then testified that he tested the petitioner privately in a room in the courthouse. The procedure was first explained to the subject and she was told of the series of eight questions that would be asked her.
She was attached to the machine and that she was asked, ‘ ‘ Did you have sexual relations with respondent in August of 1969?”. Answer, “Yes”. “Did you have sexual relations with others in August of 1969?”. Answer, “Yes”. “Is it possible another man is the father? ”. Answer, “ Yes ”.
The graph from her test was admitted in evidence and the examiner illustrated how on each of the critical questions there was no significant change in her bodily responses. Heart beat and respiration, for example, never changed, all indications of truthfulness.
The examiner then stated, that in his opinion, petitioner was telling the truth during her examination.
The witness then further testified that when the test was finished, she also admitted to him that she had had sexual relations at least three times with another man during the critical period, but that since the man was over 55 years old, she did not think he was capable of being the father.
Here we have a situation where the lie detector can be at its best. Petitioner is shown to have been truthful on the machine and untruthful in court on the selfsame issue.
Polygraph tests have been used as a guide to determining the truth for over 25 years in this country. Business, industry, prosecutors, police and attorneys use it now routinely with confidence. Everyone but the court’s have found it a useful, reliable, guide to the truth.
Surely it is time for the courts in proper cases to use polygraph results, not as a substitute in any way for Judge or jury, but as a modern adjunct to justice, an added sign post on the difficult road to truth.
Its use in paternity cases is particularly apt. First of all, the unwed mother is a reluctant witness in most cases. If the *723 child is on welfare, she is pressed by Social Services to name the father who is going to have to pay for the child. She then has no desire to see him involved. Also, immoral though she has been, she has her standards, and is reluctant to admit that she was having relations with more than one man at a time. So she denies this.
If she finally appears in court, she will continue to deny relations with others. The respondent will claim, either no relations with her at the time of conception, or that others were also involved. You have two directly opposing stories, only one of which can be true.
From such poor material as this, the court is supposed to weave a spotless robe of truth with which to clothe the figure of justice.
Every day courts are filled with witnesses who color the facts everywhere from exaggeration to perjury. Any experienced Trial Judge or courtroom attorney will privately admit that perjury is the best defense there is.
So, historically, courts have admitted a variety of collateral matters in evidence on the theory that they have a bearing on credibility. Unchastity of a rape victim, conviction for a prior crime, any degrading or unfavorable act from the witness’ past, even one’s reputation in the community for truthfulness, all these have been allowed in evidence as guides to the believability of the one testifying. We allow these collateral matters in evidence on the question of credibility, knowing that they are of dubious value, because these were the only things the courts have had to go on in this field.
Compare these with lie detector evidence. Here we have a scientific test of proven value, administered by a trained examiner who is, like the court, a neutral third party. His aim, like that of the court, is the same — a search for truth.
Certainly, polygraph evidence in these paternity cases should be used by the courts with proper safeguards, as was done here.
The lie detector is not to be taken as a substitute for Judge or jury, but as an aid to the latter in looking for the truth. No machine can be a substitute for justice, but it can be, as here, a most useful guidepost to the court, an additional road sign pointing in truth’s direction.
Our experience with court-directed polygraph tests in paternty cases here plainly points the way. When lie detector tests have been given by pretrial court order, it offers a quick, reliable method of settlement to the satisfaction of all concerned. Some respondents have readily admitted paternity when faced *724 with the machine itself. Others will admit once they know the petitioner has passed the test.
Even more significant is the protection respondents get from the lie detector’s searching eye that routinely uncovers false claims on the part of the petitioning mothers. When petitioner fails the test, she will often admit her error openly or will fail to appear for trial. Thus dubious cases are disposed of promptly without delay.
Court approval of pretrial polygraph tests and the subsequent admissions of the results in evidence in paternity cases offer a safe, method of disposition. True, prompt justice can surely be more safely achieved by this method than by any other.
The test can be a valuable aid in paternity cases where one or more parties testify. The test, of course, cannot be used against the respondent if he does not testify: — I-f-his test were used against him when he did not testify, Ijhis would be subverting his right not to testify as set out in section 531 of the Family Court Act. It can only be used if he testifies, and then simply to measure his credibility. Whenever either of the parties takes the stand and the polygraph examination has been given, it should be admitted under proper safeguards for the value it has in measuring the believability of these witnesses.
So, what do we have here? A woman who swears in court that she had no man other than the respondent during the time of conception. Is she to be believed?
Reading between the lines, the court can look for the traditional things we use to test her testimony. We see that she has had sexual relations with men since she was 16. That she had a child illegitimately before this one. That on that occasion she could not pinpoint who the father was. She admittedly has been sexually promiscuous at various times. Most significantly, she has never approached this respondent on the parentage of this child.
Now, add to this, the fact that on the lie detector she admitted having had intercourse with another man during the critical period and that in the opinion of the examiner she was telling the truth when she said this.
The result is, the petitioner becomes a person totally unfit to be believed.
Petition denied; submit order.