OPINION OF THE CURT
Edwin Kassoff, J.
The plaintiff commenced this action to recover commissions allegedly owed to him by defendant while he was in its employ, and for additional commissions owed him for modified contracts. Defendant counterclaims for alleged loans and advances made to the plaintiff.
Plaintiff was employed as a salesman by defendant corporation from April 1, 1971 to September 30, 1976. His duties included rendering estimates and entering into contracts for building and general construction jobs on behalf of the defendant. Plaintiff alleges that throughout the period of his employment defendant agreed to pay plaintiff for his services a sum of money equal to 10% (or a lesser percentage if otherwise expressly agreed to as to a specific job) of the amount of any contract accepted by the defendant as a result of sales and contracts consummated through plaintiff’s efforts as a salesman.
Plaintiff alleges that through his efforts he consummated contracts between defendant and sundry customers whereby, and pursuant to his agreement with the defendant, plaintiff earned commissions in the amount of $56,647. At trial, it was stipulated that plaintiff has received partial payments totaling $40,595, leaving a balance allegedly due plaintiff of $16,052.
Defendant claims that its payment to plaintiff was the total amount due him and that defendant never agreed to pay a 10% commission for each contract. During the trial, the plaintiff stipulated that he owed defendant $1,600 for work, labor and services. Thus, the amount of plaintiff’s claim in issue is $14,452, plus any additional commissions due plaintiff on modified contracts.
*512 Defendant contends that the alleged oral employment agreement was not to be performed within one year and is therefore unenforceable pursuant to section 5-701 of the General Obligations Law. The court finds the defense of the Statute of Frauds to be without merit and rejects it. The employment agreement was one of an indefinite hiring, terminable at will, and hence not within the statute, since it might be performed within one year. (See Rathbone v Mion, 282 App Div 797; Posner v Precision Shapes, 271 App Div 435; Dreifus v Rothstein, 51 NYS2d 573.)
The only issue remaining is whether defendant had agreed to pay plaintiff a 10% commission for each contract that he obtained for defendant. If the court decides in the affirmative, plaintiff is entitled to a judgment of $14,452, together with an accounting of all sums of money earned by defendant as a result of modification of contracts which he obtained.
The court is confronted with a purported oral agreement between the parties made without the presence of witnesses, with each party making contrary statements as to the nature of the agreement. This type of dilemma gives rise to an ideal situation for the use of a polygraph examination.
Accordingly, the court requested that the attorneys for all parties confer privately with their clients and determine whether the plaintiff and defendant and their respective attorneys would enter into a stipulated agreement whereby the plaintiff and the defendant by Slavko Bernic, president of the defendant corporation and the party who entered into the employment contract with the plaintiff, would each undergo a polygraph examination conducted by Victor C. Kaufman, with the results to be admitted as some evidence in chief for the court’s consideration along with all other evidence. The court further instructed that under no circumstances were the attorneys or their clients permitted to signify to the court which party, if any, withheld consent.
The parties and their respective attorneys conferred outside of the presence of the court. When they appeared before the court, the parties individually, as well as their respective attorneys, stipulated and agreed that the plaintiff and Slavko Bernic would undergo a polygraph examination, with the results to be admitted as some evidence in chief for the court’s consideration, along with all other evidence.
Polygraph examinations were conducted by Victor C. Kaufman, founder and chief examiner for the New York Lie *513 Detection Laboratories. Mr. Kaufman received his LL.D. degree from St. John’s University School of Law in 1939 and served for 23 years as commander of a detective squad in the New York City Police Department. He is a member of the American Polygraph Association, a past president of the Polygraph Examiners of New York State, Inc., has been licensed as a polygraph examiner in Vermont and South Carolina, and has personally conducted more than 10,000 polygraph examinations. Mr. Kaufman used a four pen Stoelting Polygraph, which operates on the theory that one who knowingly lies undergoes physiological changes in pulse rate, respiration, blood pressure and the skin’s resistance to electricity.
The polygraph examiner poses questions of three types: those deemed "irrelevant” since the testee is expected to experience little or no stress in responding, e.g., "Is your name John Paul?”; those deemed "control” since the testee experiences a heightened physiological reaction by denying a broad inquiry into past activity, e.g., "Have you ever stolen anything?” — "Have you ever lied?”; and questions concerning the event in issue, which should be of greater importance to the testee than the control questions, so that a lying testee is expected to experience a physiological reaction in excess of the control reaction, e.g., "Did you lie on the first of May?” (See Reid & Inbau, Truth and Deception: the Polygraph ["Lie-Detector”] Technique [2d], pp 27-31.) Physiological changes are recorded on a chart by means of sensors connected to the testee’s person. The accuracy of the polygraph device in distinguishing a lie from the truth is directly related to the examiner’s expertise in fixing the scope of the examination, phrasing test questions, determining the question sequence, and recognizing significant recorded changes. Furthermore, the examiner must be trained to detect the symptoms that indicate a testee is psychotic, feebleminded or a pathological liar, since in these circumstances polygraph results decline in reliability. (See Reid & Inbau, supra, pp 247-250, 303-307; McCormick, Evidence [2d ed], § 207; O’Connor, "That’s the Man”: A Sobering Study of Eyewitness Identification and the Polygraph, 49 St. John’s L Rev 1, 14, n 48; Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale LJ 694, 696-714.) The court is satisfied that the examiner who administered the polygraph examination used in this case was indeed well qualified and competent to do so.
*514 As early as 1923, in Frye v United States (293 F 1013), the results of a Marston systolic blood pressure deception test were barred from admission into evidence on the basis that the testing device had not gained "general scientific acceptance.” The point of view established by the Frye standard— viz., that "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs” (Frye v United States, supra, p 1014) — was adopted by the New York Court of Appeals 15 years later in People v Forte (279 NY 204) and remains the law in this State. (See, e.g., People v Leone, 25 NY2d 511; Sowa v Looney, 23 NY2d 329; People v Guerin, 47 AD2d 788; People v Black, 86 Misc 2d 909; People v Hargrove, 80 Misc 2d 317; People v Dodge, 72 Misc 2d 345; People v Jacobson, 71 Misc 2d 1040; People v Dobler, 29 Misc 2d 481.) It may be argued, however, that the standard of "general scientific acceptance” is not the appropriate measure for testing the admissibility of polygraphic evidence, since " '[gjeneral scientific acceptance’ is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence(McCormick, Evidence [2d ed], § 203; emphasis added.)
While this court must follow the result reached in People v Forte (supra), that case is not considered determinative of the question raised where the parties in a civil action stipulate that one or both will take a polygraph examination and further stipulate that the test results will be admitted as some, but not conclusive, evidence in chief of past acts or present intentions. At the outset it should be noted that a stipulation is a consent agreement and therefore this case is distinguished from instances where one party seeks to introduce polygraphic evidence without the consent of the opposing party (e.g., People v Leone, supra; People v Forte, supra). Moreover, since the "general scientific acceptance” standard was forged in a criminal setting, Forte does not preclude the belief of this court that the same strict standard should not be applied in those civil cases where the parties stipulate that they will admit polygraphic evidence.
At minimum, an inquiry into the current state of the law concerning the validity of a stipulated consent to take the test and admit the results in evidence ends in an open question. The Court of Appeals has stated that "[wjith respect to the admissibility of evidence of polygraph tests taken upon stipu *515 lation of the parties, the courts are not in agreement * * * We need not reach such question in this case”. (Pereira v Pereira, 35 NY2d 301, 307.) In Pereira (supra, p 307), the court held that it was error to admit polygraphic evidence in a civil contempt proceeding, since "the stipulation herein was a limited one — it did not provide for use of the polygraph tests in court.” Similarly, in Kresnicka v Kresnicka (48 AD2d 929), the court held that "the results of certain polygraph examinations voluntarily taken by the parties will not be admissible, since their use as evidence was never agreed to”. Pereira and Kresnicka provide support by implication for the limited holding of this court that a stipulation by the parties for one or both to undergo a polygraph test and admit the results as some evidence in chief is not objectionable in a civil suit.
On February 19, 1979 Slavko Bernic appeared at the office of the New York Lie Detection Laboratories and was examined by Victor C. Kaufman, polygraphist. None of the parties to the action was present, nor was Mr. Bernic’s attorney.
Mr. Kaufman asked Mr. Bernic the following questions, which he answered with a "Yes” or "No”:
"Q. Did you agree to give Victor Zinn 10% unless a lesser sum was agreed on?
"A. No.
"Q. Did Victor Zinn ever give you a job where you did not agree on the commission?
"A. No.
"Q. Did you and Victor Zinn agree to negotiate commissions on a job by job basis only?
"A. Yes.”
In Mr. Kaufman’s report addressed to the court, he states that it is his opinion that "physiological reactions to the above relevant questions were of such a nature as to be generally indicative of deception.” The reference is to the questions cited above.
On February 19, 1979, Victor Zinn appeared at the office of the New York Lie Detection Laboratories and was examined by Mr. Kaufman. Again none of the parties to the action was present, nor was Mr. Zinn’s attorney.
Mr. Kaufman asked Mr. Zinn the following questions:
"Q. Did Slavko Bernic agree to give you a 10% commission unless a lesser sum was agreed upon?
*516 "A. Yes.
"Q. Did you always discuss a commission rate for each job with Slavko Bernic?
"A. No.”
Mr. Kaufman’s report addressed to the court states that it is his opinion that "No deception was indicated in this examinee’s recorded responses to the above relevant questions and it is this polygraphist’s opinion that he answered all these questions truthfully.” The reference is to the questions cited above.
When the results of the polygraph tests are admitted into evidence, it is not intended to outweigh all other evidence. The results of the polygraph test are not controlling, but should be considered with all other evidence. It is not inconsistent to accept the results of a polygraph test and nevertheless decide contrary to its conclusions after taking into consideration all the evidence that was introduced during trial.

The procedures and guidelines used by the court regarding the use of the polygraph test were:

1. The court gave the parties and their attorneys an opportunity to determine whether or not they agreed to have the polygraph test administered.
2. The court directed that the discussion between the attorneys and their clients be held outside the presence of the court.
3. The parties agreed who would bear the expense of the polygraph test.
4. The court instructed that in the event either of the parties or their attorneys did not agree to have the test taken, the court should not be informed as to the identity of the party or the attorney who refused to enter into a stipulation.
The court was assured that the parties understood what the polygraph test is, how it is given and the legal effects of taking the test.
6. The parties individually, under oath, stipulated to taking the test, and their respective attorneys consented to their agreement.
7. In addition to stipulating to take the test, the parties also stipulated that the test results will be admitted as some, but not conclusive, evidence in chief of past or present intentions. It would not be controlling but should be considered with all other evidence.
*517 8. The test was administered by a qualified and competent examiner who the court determined to be an expert to operate the machine and interpret the results.
9. The court may find that it is not inconsistent to accept the results of the polygraph test and nevertheless decide contrary to its conclusions after taking into consideration all the evidence that was introduced.
The court, after considering all the evidence, including the polygraph tests, the testimony of the parties and all exhibits in evidence, finds as a matter of fact that the defendant, through its president, Slavko Bernic, did enter into an oral employment contract, terminable at will, in which defendant agreed to pay plaintiff a 10% commission for each contract obtained through plaintiffs efforts unless a lesser sum was specifically agreed upon.
Accordingly, the court finds for the plaintiff in the amount of $14,452 and directs the defendant to account for all sums of money earned by him arising out of modified construction contracts which were obtained by the plaintiff, and upon such accounting the defendant is directed to pay to the plaintiff his commission of 10%.
Defendant is directed to serve and file an accounting for all modified construction contracts obtained by the plaintiff within 20 days of service of a copy of the judgment to be entered hereon.
Plaintiff shall serve and file his objections to the accounting, if any, within 10 days thereafter.
Any issues raised by said objections shall be referred to a referee to be named in the judgment to be entered hereon.
The remainder of defendant’s counterclaim is dismissed.