OPINION OF THE COURT
Adolph C. Orlando, J.
Defendant, William Daniels, charged with robbery in the second degree (two counts), petit larceny and criminal possession of a weapon in the fourth degree, seeks to introduce into evidence at trial the favorable results of his polygraph test.
On December 28, 1978, a delicatessen located at 350 South Columbus Avenue, Mount Vernon, New York was allegedly "held up”. Two youths entered, displayed a firearm, demanded and took money from the operator of the establishment, Lucille Spaulding.
After viewing a number of photographs at police headquarters in Mount Vernon, she identified the defendant as one of the perpetrators. A warrant for his arrest was issued. Mr. Daniels was arrested for the alleged crime on January 29, 1979, and thereafter was indicted by a Grand Jury of Westchester County for the offenses charged. He pleaded not guilty on the arraignment and has steadfastly denied any participation in the alleged crime.
On April 26, 1979 at the request of defense counsel, a practicing polygrapher, Mr. Victor Kaufman, administered a polygraph test to Mr. Daniels. Mr. Kaufman issued a written report and found that the defendant’s denials of presence and participation in the December 28, 1978 incident were not deceptive as indicated by his responses. As an expert in polygraphy Mr. Kaufman concluded that defendant was truthful.
Shortly thereafter, defense counsel made the results of the examination known to the Westchester County District Attorney’s office. She offered that defendant be examined by a polygraphist of the People’s choosing and that they simultaneously stipulate to the admissibility of such finding in evidence. The District Attorney’s office responded in the negative. They did not wish to administer a polygraph test nor stipulate to the admissibility of such finding in evidence.
Prior to trial, defendant by his counsel, moved by order to show cause and requested an order directing a hearing be held prior to trial to determine whether the polygraph results should be admitted into evidence in light of the fact that the *543 polygraph had probative and scientific value and that this case hinged on a single eyewitness identification of defendant.
The court granted the hearing and defendant called expert witnesses to establish the reliability of the polygraph, its technique and its wide acceptance.
I. POLYGRAPH — THEORY AND OPERATION
A meaningful analysis of the polygraph must begin with the technique employed therein.
Essentially, the theory underlying the polygraph is that an individual’s autonomic nervous system continues to function in a normal fashion where he or she is being truthful. On the other hand the necessity to conceal either through outlandish lies or less than full disclosure will result in stress responses or changes which are observed and monitored by the instrument.[1] (United States v Wilson, 361 F Supp 510, 512.) The instrument records the physiological fluctuations that are demonstrated while aided by three basic components: (1) The pneumograph which gouges the respiration rate; (2) the cardiosphygmograph which measures the blood pressure and pulse rate; and (3) the galvanometer which monitors the galvanic skin responses. Recently, a new device has been incorporated in the instrument that measures unobservable muscular activity and assesses the attempts to control the other responses that are chartered by the polygraph. (United States v Alexander, 526 F2d 161, 163.)
The polygraph test is administered by an examiner qualified in polygraphy. He interviews the subject privately and throughout the test no one is admitted in the room other than the examiner and the subject. A pretest interview is conducted lasting approximately one hour or more. The test itself takes but a few minutes and normally consists of a few questions.[2] The examiner uses three types of questions for the examination. The irrelevant question where little or no stress is recorded in the response. The control question where an investigation of past activities necessarily renders greater reaction, and questions directly relevant to the matter in issue.[3] (Zinn v Bernic Constr., 99 Misc 2d 510, 512-514.)
The different changes in respiration rate, blood pressure, *544 pulse rate and skin resistance elicited from the responses to the questions are simultaneously monitored by the components and are transmitted and recorded by pen onto a piece of paper commonly referred to as polygraph and/or chart.[4]
The chart is then interpreted by the examiner. After an evaluation of the subject’s behavior, but giving prime importance to the chart, he arrives at an opinion.[5]
II. STANDARD OF ADMISSIBILITY
The threshold question to be determined in the first instance is what standard to apply before polygraph results may be properly introduced into evidence.
A. EXCLUSION RULE
The first appellate case that considered the question to admit polygraph evidence was Frye v United States (293 F 1013) in 1923. There the court was asked to overturn a murder conviction on the ground that the trial court had erred in refusing to admit into evidence the exculpatory results of a lie detector device that measured only changes in the systolic blood pressure. The instrument was crude and primitive but was the forerunner of today’s polygraph. In adhering to the trial court decision the Frye case essentially underscored that the device as such, had not been generally accepted in the particular field it belonged. More specifically, the machine and its technique had not gained the acceptance and scientific recognition among psychological and physiological authorities. In addition, it had not passed from the experimental to the demonstratable stage (supra, p 1014). It did not, however, delineate the scientific field it belonged nor whether the instrument and its technique were acceptable therein.
The standard enunciated in Frye was subsequently followed in a number of jurisdictions and in both Federal and State decisions.[6] Recently, a number of cases, though still clinging to *545 the Frye standard have admitted the evidence upon stipulation and others upon carefully worded exceptions.[7]
In New York, the first appellate review of the polygraph arose in People v Forte (279 NY 204). The defendant in a murder trial, after the close of the evidence, moved to reopen so that he could be examined under a pathomer, "lie detector”. The court affirmed the trial court’s exclusion upon the ground that no evidence had been shown that properly qualified the instrument for general scientific recognition. In fact, the defendant therein did not properly lay the foundation necessary to establish the instrument and the sufficient reliability of its technique (supra, p 206).
In 1969 in People v Leone (25 NY2d 511), the Court of Appeals followed the basic criterion of Forte but gave considerable weight to the qualifications of the polygrapher as being the central issue therein. The court relied primarily on the inexperience of the examiner in upholding the exclusion of polygraph evidence. (Walther v O’Connell, 72 Misc 2d 316, 318.)
More recently, New York courts have admitted polygraph evidence upon stipulation and in other specific cases where the issue to be decided was of primary importance and the aid of the polygraph highly probative.[8]
B. RELEVANCY RULE
In line with the increasing judicial acceptability of the polygraph some have argued that general scientific acceptance is a proper avenue for the court to take judicial notice of a scientific fact but not the appropriate criterion for testing and admitting scientific evidence, and more specifically polygraph evidence.[9]
To require general acceptance would in essence mandate *546 absolute infallibility. Instead, a court should weigh and consider the admissibility of polygraph results in the same manner it makes other decisions relating to admissibility of any evidence. If the evidence has substantial probative value and is relevant to the issue and does not endanger defendant’s rights, or prejudice the jury, nor mislead the proper administration of justice, that it should be admitted as any other evidence.[10]
Evidence is relevant if it aids in making the existence of a fact while arriving at a conclusion more or less probable than without such evidence.* [11] Polygraph evidence in particular is highly probative and relevant in that it is useful in assessing the subject’s credibility to the ultimate issues of the case.[12]
Since the evidence sought to be admitted is essentially opinion evidence, the issue is whether an expert may testify, present charts and explain his conclusion as to whether the subject was telling the truth or lying to pertinent questions.[13]
The admissibility of evidence in any case rests within the sound discretion of the trial court (United States v Marshall, 526 F2d 1349, 1360, cert den 426 US 923; United States v De Betham, 348 F Supp 1377, affd 470 F2d 1367, cert den 412 US 907; United States v Penick, 496 F2d 1105, 1110, cert den 419 US 897) and may not be overturned upon review unless it is manifestly erroneous and an abuse of discretion. (United States v Oliver, 525 F2d 731, 737, cert den 424 US 973; United States v Bursten, 560 F2d 779, 785.) Under traditional standards the proffering party must lay an adequate foundation for the testimony (United States v Lanza, 356 F Supp 27, 30; United States v Wainwright, 413 F2d 796, 803, cert den 396 US 1009) and upon the proper case the court must require a showing that (1) the evidence rests on a valid principle of science so that the evidence may aid the trier of the facts, (2) the expert witness is sufficiently qualified in the field of his expertise, (3) the scientific test under consideration properly followed the applicable procedures in the field and other related experts and (4) probative value overcomes policy consideration.[14] (State v Dorsey, 88 NM 184; United States v Ridling, 350 F Supp 90, 94.)
*547 Whether one agrees that polygraph is a science or not, the judiciary can no longer afford to disregard such evidence by merely denouncing it for failing to meet the standard of general acceptance as rigidly enshrined by Frye in 1923. The testimony, if it is to be received, must be probative and the test must be reasonably reliable and its technique accepted within the expert’s profession.[15] (State v Alderete, 86 NM 176, 178.)[16]
The court fully indorses this standard as the most fair and effective method of evaluating scientific evidence. It notes that this method is certainly not unique since it is consistently applied in many other areas relating to scientific evidence. Fingerprints, ballistics evidence, blood tests, voice prints, neutron activation analysis and others have all passed the same standard and have been admitted into evidence for the jury’s evaluation.[17] (United States v Ridling, supra.)
III. THE ADMISSION OF POLYGRAPH EVIDENCE IN IDENTIFICATION CASES
 Though it is constantly argued that the polygraph and its technique have not achieved the degree of scientific recognition, such as fingerprinting, ballistics, etc., it surely has achieved substantial recognition. Circumstances may not render the admission of the polygraph in all cases. However, where the possibility that a conviction may stand or fall on a single eyewitness identification which is "proverbially untrustworthy”[18] and less reliable than the polygraph, then fairness dictates that it may be received in evidence if the appropriate criterion is met.[19]
The issue here is vital to the case. There is a likelihood that an innocent man may be convicted. There are a number of examples where a detailed, positive identification made and admitted into evidence with good faith by the eyewitness can *548 be totally incorrect.[20] The problem is so vital and the potential for injustice so great, that the Supreme Court felt compelled to mandate procedural guidelines in pretrial identification. (United States v Wade, 388 US 218; Gilbert v California, 388 US 263; Stovall v Denno, 388 US 293.)
There is no reason why qualified polygraphers should not be welcomed by the courts confronted with such a situation. (State v Chambers, 240 Ga 76, 77-78.) No instrument can be a substitute for justice and fairness, but it can be useful in arriving at the truth and rendering the proper administration of justice. (State v Woo, 84 Wash 2d 472, 474; Matter of Stenzel v B., 71 Misc 2d 719, 723.) The particular circumstances and extraordinary questions contained herein argue against exclusion but rather cry out for admission.
A proper demonstration of the instrument’s reliability and accuracy, together with the examiner’s competence is a proper predicate for the admission of polygraph evidence.
The court, in considering the relevant and probative objectives herein has concluded that the test for admitting expert testimony concerning the polygraph has been met. The court is satisfied that the accuracy and reliability of the instrument and the examiner have been properly exhibited.
Unlike the instrument in 1923, the machine in use today is no longer primitive and crude[21] (United States v Zeiger, 350 F Supp 685, 688 rev without opn 475 F2d 1280) but rather highly sophisticated, miniaturized and sensitive.[22] The instrument has been refined and has become increasingly more responsive to the autonomous stimuli. In the 1920’s the polygraph was but two channels and monitored only two basic functions: the relative blood pressure and breathing. A third channel, measuring galvanic skin responses was added in the 1930’s and it became the standard unit until very recently. The instrument now consists of four channels and that channel may be used to gouge the chest and stomach breathing or measure how fast the heart is beating and its changes therein. There also has been improvement and the availability of different scales. For example, the galvanic skin responses were subject to some distortion where now the scales are much more linear and provide as little distortion as possible.
*549 The polygraph as being a valid and reliable research area for scientists has dramatically increased in the last few years. The result has been greater acceptability of the technique and its recognition as a body of systematized knowledge. (United States v De Betham, 348 F Supp, supra, at p 1384.)
The use of controlled questions has provided probative and more effective results than before. Reliance on this newer format has brought about fewer inconclusive results. In recent research, laboratory and field situations have established the reliability and accuracy of the polygraph at about 90%.[23] Dr. "Ballard, who "testified at the hearing, set the accuracy figure, without taking the inconclusive results into consideration, as between 80% to 95%.
In light of its reliability the polygraph has been used and is presently used extensively in government, law enforcement and private industry.[24] (People v Barbara, 400 Mich 352, 384.) Police, District Attorneys’ offices and other investigative agencies rely on it on a daily basis.[25] (State v McDavitt, 62 NJ 36, 45; United States v Ridling, 350 F Supp, supra, at p 93.) More specifically, the Army, National Security Agencies and the Department of Defense used it widely, and it is used in commerce, labor, particularly in pre-employment screening and other investigative purposes.[26]
The examiner is of primary importance and vital to the making of a qualified decision.[27] Since the polygraph results must be interpreted and diagnosed, they are by the very nature of the procedure dependent upon the competence, experience and training of the operator.[28] Frequently, the examiners are not properly educated and inexperienced.[29] Therefore, the examiner must have the highest professionalism and be fully devoted to the field.[30]
The expert testimony regarding the polygraph demands *550 more than just adequate knowledge. (United States v Oliver, 525 F2d supra, at p 738.) What is required is a high degree of training, experience and ability. (Commonwealth v A Juvenile, 365 Mass 421, 426-427.) Unlike before, the examiner is better trained, more experienced and knowledgeable than in the past. Professional schools have enlarged their curriculum and extended the hours. One school in Michigan has an extensive training period lasting six months.
At another level, the polygraph examiners have organized into a national organization which has set qualification standards, yearly seminars and specific publications directed at the very core of its science. (United States v Zeiger, 350 F Supp, supra, at p 688.) A new member need not only possess a college degree or equivalent of such but must undergo a thorough and rigorous written and oral examination. He must have conducted more than 200 examinations and must be a graduate from a training school accredited by the organization. Moreover, half of the States now require licensing of polygraph examiners as a method of regulating this very controversial area.
IV. THE CASE — AGAINST ADMISSION
The court is aware of the number of objections outlining the difficulties and hazards of admitting the polygraph results in evidence. The criticism is directed primarily to three areas. The polygraph "can be beaten” by unfit subjects. The technique and examiner lack accuracy and standardization. Policy considerations outweigh admittance.
Opponents argue that:
(1) A person may affect the polygraph result if he is under a mental and/or physical disability.[31]
Abnormal heart rate or blood pressure, alcoholic intoxication may render the subject unfit and hence the results speculative. (United States v De Betham, 348 F Supp, supra, at p 1387.) Mental defectives, psychotics, and pathological liars may affect and distort the result. The latter is an extremely rare subject in polygraph examinations. (United States v De Betham, 348 F Supp 1377, supra.) Reliable studies have shown that the pathological liar may be detected as any other criminal subject and without enduring any greater difficulty.[32]
*551 Drugs such as tranquilizers, amphetamines, may have an effect but are normally disregarded. Generally, if the influence of physical and mental abnormalities is sufficiently high to alter and affect the result of the polygraph, they are usually apparent either to the recording or the examiner. (United States, v De Betham, supra.) A competent and qualified examiner will carefully look for those signs and will adjust his opinion accordingly. Drugs, if potent enough to reduce the responsiveness may increase the probability of inconclusive results, but there is no known drug which will selectively decrease the reaction without having the same affect on the controlled question. Similarly, transcendental meditators and those who practice yoga may reduce the responsiveness but may be detected by the same method.[33]
(2) Test condition may cause unreliable readings.[34] (United States v Alexander, 526 F2d, supra, at p 165.)
Again a qualified examiner will easily preclude distortion in reading by eliminating the conditions which tend to affect the examination beforehand. (United States v Wilson, 361 F Supp, supra, at p 513.) In short, the chance of beating the polygraph is no greater than outwitting the jury.
(3) The absence of standards for examiners’ qualifications and the inherent bias of their procedure.
An evaluation of the competence of the examiner and the reliability of the procedure could be achieved without any undue hardship or waste of time. The trial court will examine the qualifications of the operator to assure that the technique used is reliable and that his opinion is both relevant and probative.[35] Even though the expert may be found reliable by the court, as a further safeguard a party may always challenge his qualifications and competence by cross-examination, and of course the jury may always disregard any and all of his testimony. (United States v De Betham, 348 F Supp, supra, at p 1388.)
To avoid bias or deflate the theory of the "friendly polygrapher”, the court and any party to the litigation may scrutinize the examiner’s qualifications and reputation. Whether he is licensed, a member of the American Polygraph Association and whether he subscribes to their code of ethics are all *552 factors that may be considered. To still lingering doubts, the court may appoint, or a party may wish (subject to the court’s approval) that an independent examiner be retained to evaluate the chart and to give a second opinion.
(4) The jury will be prejudiced, confused and misled by the testimony of the polygraph expert.[36]
The. basic argument is that the test itself will be given greater weight than any other evidence since the testimony will be considered as having the aura of infallibility[37] (United States v Alexander, 526 F2d, supra, at p 168), and more specifically the fear is that it will control the ultimate issue of guilt or nonguilt.[38]
The aim of any trial is the search for the truth. The polygraph testimony, as any other evidence, will aid the trier of the facts in ascertaining the truth.[39] Once the evidence has been established to be relevant and probative it is their function to consider it as any other evidence and it is the jury’s prerogative to give it as much or less weight as they may deem appropriate.[40] It is introduced as any other expert evidence and as such can and will be subjected to an extensive arid rigorous cross-examination.[41] (United States v Ridling, 350 F Supp, supra, at p 98.) Moreover, the court appropriately so, would instruct the jury as to how to evaluate this scientific evidence.[42]
It is interesting to note that today’s juries are different from the juries of days gone by. Their educational background is better, they are very attentive, widely read and on the whole more knowledgeable. They are capable of consuming all kinds of evidence and sorting out the evidence which is believable from the incredible. (United States v Ridling, 350 F Supp 90, supra.) In Coney v State (258 So 2d 497, cert den 262 So 2d 448 [Fla]) a robbery case, the defendant was able to introduce into evidence the exculpatory results of the polygraph. The jury weighed the evidence of eyewitnesses and the expert *553 testimony of the polygrapher and found defendant guilty of the crime charged.
(5) Polygraph evidence as violative of the Fifth Amendment.
A polygraph examination is essentially communicative, testimonial in nature and within the guarantees of the Fifth Amendment. (Schmerber v California, 384 US 757.)
A defendant may not be compelled to take such a test. (Commonwealth v A Juvenile, 365 Mass, supra, at pp 431-432.) If he is coerced, such test is not valid. (United States v Ridling, supra, at p 97.) The problem does not arise too often since the defendant may take the test voluntarily and hence waive his constitutional guarantees. (Miranda v Arizona, 384 US 436.) Or if the defendant does want to introduce the exculpatory results of a test administered by an examiner of his own choosing, it would seem that the prosecution has the right to request a second examination without falling within the ambit of the Fifth Amendment guarantees.[43] (United States v Ridling, supra.)
(6) Hearsay problems.
Some argue that the machine may not be examined or cross-examined, and accordingly violate the hearsay rules. The results of the machine are only data from which an expert may base his opinion.[44] The subject’s answers to the questions proposed to the examiner are not admitted for the truth of the matter but rather to form the basis of the expert’s opinion.[45] The testimony that is admitted is the opinion of the expert. He is like a physician or psychiatrist who has examined a patient and expresses his opinion as to his conditions. (United States v Ridling, supra, at p 99.)
V. PROCEDURAL SAFEGUARDS
The evidence of the polygraph experts relating to the examination and opinions therewith shall be admitted upon the following safeguards and conditions.
1. The court will admit the result of a polygraph test administered to the defendant by the polygrapher of his own choosing. The court will permit the District Attorney’s office to conduct their own examination of the defendant with a polygrapher chosen by their office.
*554 The defendant on his own initiative has agreed that the examination should be admitted, after knowingly and voluntarily making the determination to do so. By this method, defendant has in essence waived his Fifth Amendment protections. (Commonwealth v A Juvenile, 365 Mass 421, supra.) In fairness to the People and the proper administration of justice and with proper safeguards for the constitutional guarantees of the defendant, the defendant’s waiver of Fifth Amendment rights of self incrimination are only waived to the extent that those rights relate to the issues herein and only those in this case. (People v Vernon, 89 Misc 2d 472, 476.)
2. The examination shall be conducted by a competent, experienced and qualified examiner. Defendant will submit himself for the test upon a mutually agreed time. (United States v Ridling, 350 F Supp 90, supra.)
3. The court in the first instance shall determine at a hearing whether the two experts have sufficiently met the standard set by the court so that their opinion is reliable. (Zinn v Bernic Constr., 99 Misc 2d, at p 517.)
4. Among the qualifications the court will consider but not necessarily limit itself to are that the examiner:
(a) Must have a college degree from an accredited university or college or in the alternative a high school diploma and a number of years of experience.[46]
(b) The examiner must be licensed in the State in which he practices; if none is required, licensed by other States.[47]
(c) Graduate from an accredited professional school with a six-month training period.[48]
(d) Polygrapher should be a member of national and State professional associations.[49]
(e) Must have extensive experience in polygraph tests and more specifically within the criminal area.[50]
(f) The examination should be conducted with controlled questions without undue deviation from the chart results.[51]
*555 (g) The polygrapher should score the chart on a numerical basis.[52]
5. The court may refuse the evidence if it finds that the examiner does not meet the qualifications, or the test was not conducted under the proper conditions and guidelines as set forth herein.[53]
6. If it meets the standard as outlined, both tests shall be introduced at trial.
7. The results, charts and all other pertinent data must be maintained and exchanged before trial in order for a party to familiarize oneself with it for possible cross-examination.
8. The polygrapher may be cross-examined as any other expert witness, that is:
(a) The examiner’s experience, qualifications and expertise may be subject to scrutiny; as well as,
(b) the test conditions;
(c) the chance for error;
(d) and any other pertinent matter relating to the issue in question, subject of course, to the court’s discretion.[54] (State v Valdez, 91 Ariz 274, 283; State v Steele, 27 NC App 496.)
9. The opinion of a polygraph examiner is direct evidence and may be introduced by either party on their direct case regardless of whether the defendant takes the stand or stands mute. (State v Chambers, 240 Ga, supra, at pp 78-79; Walther v O'Connell, 72 Misc 2d 316, supra.)
10. Upon admission, the evidence may be considered as any other opinion evidence. The examiner may not testify as to guilt or innocence, but rather may testify and assess the veracity of defendant’s responses to the questions asked during the test.[55] The jury shall give it whatever weight or significance it may wish in their function as the trier of the facts. (State v Jenkins, 523 P2d 1232, 1234 [Utah]; State v Chambers, 240 Ga 76, supra.)
11. The court in its charge will instruct the jury that polygraph evidence is only expert opinion and may be erroneous.[56]
The jury has the duty to evaluate the opinion and may, if it *556 wishes, reach a conclusion contrary to that of the expert[57] (State v Valdez, supra, pp 283-284), that the evidence does not prove or disprove any element of the crime charged[58] but is only an indication of whether the defendant was deceptive or not at the time of his responses. (State v Ross, 7 Wash App 62.) The guilt or nonguilt remains their task alone.

. See, also, 27 U Miami L Rev 254.

.14 Am Jur, Proof of Facts 2d 1,10.

. See, also, Reid & Inbau, Truth and Deception: the Polygraph ("Lie-Detector”) Technique (2d ed, 1977), pp 13, 28, 30.

. 51 ND L Rev 679, 682; New Trends in the Admissibility of Polygraph Test, 3 Mem St L Rev 282, 283.

. 13 Land & Water L Rev 613, 615; Notes, Pinnochio’s New Nose, 48 NYU L Rev 339, 341.

. For an extensive list of cases adhering to the Frye standard and/or rejecting polygraph evidence per se see 3A Wigmore, Evidence (Chadbourne rev), § 999, n 2; Ann. 23 ALR2d 1306, Later Case Service (1970 ed), supplementing vols 19-24 ALR2d, pp 724-732; and see LCS Supplement (April, 1979), pp 189-198; Ann. 43 ALR Fed 68, 78; New York cases rejecting the polygraph see Schatkin, Admissibility of Polygraph Evidence in the State of New York, 412 NYS2d Advance Sheet Nos. 3, 27, 29.

. Among some of the examples see Commonwealth v A Juvenile, 365 Mass 421; People v Barbara, 400 Mich 352 (may be introduced on postconviction hearing on motion for new trial); United States v Ridling, 350 F Supp 90; United States v Zeiger, 350 F Supp 685, revd without opn 475 F2d 1280; People v Cutler, No. A176965 (Superior Ct LA County Cal, Nov. 6, 1972); State v Dorsey, 88 NM 184; State v Stanislawski 62 Wis 2d 730; State v Souel, 53 Ohio St 2d 123; State v Chambers, 240 Ga 76; Coney v State, 258 So 2d 497 [Fla]; State v Valdez, 91 Ariz 274; Commonwealth v Graziano, 371 Mass 596.

. See Schatkin, Admissibility of Polygraph Evidence in the State of New York, 412 NYS2d Advance Sheet Nos. 3, 31, 36-39.

. McCormick, Evidence (2d ed), § 207.

. 55 BU L Rev, 302, 304; McCormick, Evidence (2d ed), § 202.

. Notes, Pinnochio’s New Nose, 48 NYU L Rev 339, 345 (supra).

. Id., at p 346.

. McCormick, Evidence (2d ed), § 207.

. Romero, Admissibility of Scientific Evidence Under New Mexico and Federal Rules of Evidence, 6 NM L Rev 187.

. 3A Wigmore, Evidence (Chadbourne rev), § 990.

. Overruled by State v Lucero (86 NM 686); subsequently Lucero was overruled by State v Dorsey (88 NM 184, supra).

. See, also, O’Connor, "That’s the Man”; A Sobering Study of Eyewitness Identification and the Polygraph, 49 St. John’s L Rev 1, 19; Note, the Emergence of the Polygraph at Trial, 73 Col L Rev 1120, 1131; Lipton, The Results of Scientific Techniques as Evidence in Federal Courts: Evolution of the Frye v United States standard in the period 1969-1977, 8 Envtl L Rev 769 and cases therein.

. Frankfurter, The Case of Sacco and Vanzetti, p 30 (1927).

. O’Connor, "That’s the Man”: A Sobering Study of Eyewitness Identification and the Polygraph, 49 St. John’s L Rev 1,19 (supra).

. Id., at p 5.

. 51 ND L Rev 679, 692 (supra).

. 26 SC L Rev 766, 769.

. Abell, Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials; 15 Amer Crim L Rev 29, 35; Tarlow, Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System, 26 Hastings LJ 917, 929.

. Forkosch, The Lie Detector and Mechanical Jurisprudence, 28 Okla L Rev 288.

. See Tarlow, 26 Hastings LJ, supra, at p 944.

. See O’Connor, 49 St. John’s L Rev 1, supra, at p 17.

. See 51 ND L Rev, supra, at p 694.

. Ibid.; 12 Wake Forest L Rev 1128,1131.

. Menard, The Polygraph: A Critical Appraisal, 50 Fla BJ 147.

.13 Land & Water L Rev 613, 622 (supra).

. See Abell, 15 Amer Crim L Rev, supra, at pp 37-38.

. See Tarlow, 26 Hastings LJ, supra, at pp 964-965.

. See Tarlow, 26 Hastings LJ, supra, at p 963.

. See Abell, 15 Amer Crim L Rev, supra, at pp 38-39.

. Id., at p 965.

. See Abell, 15 Amer Crim L Rev, supra, at pp 50-54; O’Connor, 49 St. John’s L Rev, supra, at p 20.

. See, also, 30 Mercer L Rev 357, 361.

. Ibid.

. See Tarlow, 26 Hastings LJ, supra, at p 967.

. Ibid.

. Ibid.

. Ibid.

. See Tarlow, 26 Hastings LJ, supra, at p 957.

. Id., at p 958.

. Ibid.

. Reid & Inbau, Truth and Deception: Polygraph ("Lie-Detector”) Technique (2d ed, 1977) at p 304; 14 Am Jur, Proof of Facts 2d, pp 1,18.

. See O’Connor 49 St. John’s L Rev, supra, at p 29.

. See Reid & Inbau, supra, at p 305.

.14 Am Jur, Proof of Facts 2d 1,18.

. Id., at p 19.

. Ibid.

. aid.

. See O’Connor, 49 St. John’s L Rev, supra, at p 29.

. See, also, 3 Mem St L Rev 282, 287 (supra).

. 55 BU L Rev 302, 310 (supra).

. See 14 Am Jur, Proof of Facts n 68, supra, at p 31.

. See, also, Forum — Insurmountable Barriers for the Polygraph, 12 Tulsa LJ, 682, 696.

.12 Wake Forest L Rev 1128,1135 (supra).